ABC & XYZ, wife and husband, Appellants,

v.

The ARCHDIOCESE OF ST. PAUL AND MINNEAPOLIS, et al., Father Michael G. Kolar, Respondents.

No. C0-93-2007.

Court of Appeals of Minnesota.

March 22, 1994.

Roger R. Roe, Keith A. Queensen, Yaeger, Jungbauer, Barczak & Roe, Ltd., Jill Flaskamp Halbrooks, Eric Magnuson, Rider, Bennett, Egan & Arundel, Minneapolis, for ABC & XYZ.

Daniel A. Haws, Carol E. Baker, Murnane, Conlin, White & Brandt, St. Paul, Andrew J. Eisenzimmer, Meier, Kennedy & Quinn, St. Paul, for the Archdiocese of St. Paul and Minneapolis, et al.

Theodore J. Collins, Thomas E. McEllistrem, Collins, Buckley, Sauntry & Haugh, St. Paul, for Father Michael G. Kolar.

Considered and decided by PARKER, P.J., and HARTEN and FOLEY, JJ.

## OPINION

DANIEL F. FOLEY, Judge.

Appellant ABC brought this action in 1991 alleging that respondent Father Michael Kolar had sexually abused her for a period of 11 years. ABC's husband, appellant XYZ, brought an action alleging loss of consortium. In this appeal from summary judgment, appellants contend that the trial court erroneously interpreted the statute of limitations for sexual abuse cases when it dismissed her case based upon its determination that ABC "had reason to know" prior to 1985 that she had been a victim of sexual abuse by Father Kolar. The trial court applied the proper standard in this case. The evidence overwhelmingly establishes that ABC had reason to know prior to 1985 that she had been abused. We affirm.

## FACTS

Appellant ABC met Father Michael Kolar when she was a high school student attending a retreat at the St. Paul Catholic Youth Center (CYC). At that time in 1972, ABC was 15 years old, and Father Kolar, the director of the CYC, was 29. ABC was a devout Roman Catholic who came to know, admire, respect, and trust Father Kolar as a priest and religious counselor. After that first retreat in 1972, Father Kolar and ABC began establishing a special friendship as ABC returned to the CYC regularly for prayer sessions and counseling with Father Kolar about any problems she was having.

Over the next three years, ABC said Father Kolar slowly began wearing down the physical boundaries between them, and began initiating improper physical contact. This contact began as a kiss on the lips when she was 15 and then progressed to back rubs over ABC's clothing and under her clothing. On occasion, ABC stayed overnight at the CYC, during which time Father Kolar loaned her his pajamas and greeted her with good morning kisses. Father Kolar also made his private quarters and his shower available to ABC on numerous occasions. Shortly before

ABC's 18th birthday, she and Father Kolar engaged in sexual intercourse for the first time. By this time, ABC was completely in love with Father Kolar and Father Kolar expressed his love for her. Thus, when Father Kolar told ABC that their relationship must be kept secret, she complied.

As their relationship progressed, Father Kolar expressed to ABC his internal conflict over choosing between his love for her and his love for the church. Throughout their relationship, ABC knew that Father Kolar had taken a vow of celibacy and that his conduct with her was inappropriate. As Father Kolar began traveling as a part of his ministry in the late 1970s and early 1980s, ABC accompanied him overnight on many of these trips around the United States. Father Kolar estimated that they took at least two trips per year. Father Kolar used these times away as opportunities for sexual encounters with ABC.

In 1982, ABC discovered that she was pregnant by Father Kolar. In an attempt to protect himself and ABC, Father Kolar set up a scheme whereby ABC told her family that she was going to Bolivia on missionary work. In fact, Father Kolar had arranged for ABC to go to Chicago to bear the child and give it up for adoption. En route to Chicago with Father Kolar, ABC suffered a miscarriage. After the miscarriage, ABC suffered serious feelings of confusion and loss.

Father Kolar went on sabbatical in 1983. Upon his return in October 1983, he told ABC that he finally had made a choice to continue in his ministry with the church and to terminate his relationship with her.

As early as 1977, ABC began consulting with friends and clergy about the relationship she was having with Father Kolar. Both Father Gregory Skrypek and Father Timothy Powers testified in their depositions that their conversations with ABC focused on the turmoil ABC said she felt about being in love with a priest. To both of these men, ABC described her situation as a loving relationship with Father Kolar; neither Father Skrypek nor Father Powers ever got the impression from ABC that the relationship was abusive. Furthermore, ABC told nei-

ther of them that she had begun her relationship with Father Kolar when she was only 15. In all of her communication with these two priests, ABC expressed only her concern and mixed emotions about pursuing a relationship with a man who was torn between his love for her, as he had expressed it, and his love for the church.

In 1983, following the miscarriage and breakup of the relationship, ABC began counseling with Virgil Burns, a social worker who also had counseled Father Kolar. In his affidavit to the court, Burns said that he found ABC to be depressed as a result of her pregnancy, miscarriage, and broken relationship. According to Burns, ABC never considered her relationship with Father Kolar to be abusive, nor did he suggest to her that it had been.

ABC met XYZ in the summer of 1983. When they began dating seriously, ABC divulged the entire story of her relationship with Father Kolar to XYZ. She told him in detail of their relationship, including her pregnancy, miscarriage, and emotional turmoil because of those experiences. XYZ had attended St. Paul Seminary, was an active Catholic, and knew and respected Father Kolar. XYZ confronted Father Kolar about his relationship with ABC. Despite this background, ABC and XYZ asked Father Kolar to marry them in May 1984.

In 1989, ABC and XYZ learned that Father Kolar had been accused of taking advantage of other vulnerable young women. In March 1990, they contacted their friends, respondent James Kolar, who is Father Kolar's brother and the associate director of the CYC, and his wife, Ann. James Kolar told ABC that one relationship had occurred before ABC's involvement with Father Kolar, and the other alleged relationship had occurred after ABC's relationship with Father Kolar had ended.

In July 1990, ABC met with another victim, JB; they had the opportunity to compare and contrast their experiences in their relationships with Father Kolar. ABC learned that Father Kolar had been in a relationship with both JB and ABC at the same time. JB testified in her deposition:

When she was involved with him, when I was involved with him, how close everything was. She got pregnant. He came to my graduation open house. She miscarried in August, two weeks later he takes me out to brunch before I leave for my freshman year in college.

Since July 1990, ABC has sought counseling through Dr. Sheryl Harrison and Dr. Bruce McBeath. XYZ testified to ABC's radical personality changes since July 1990. He testified that, after ABC learned of Father Kolar's other exploits, she became depressed, went through a crisis of faith, and viewed making love with her husband as something "dirty."

In his deposition, Father Kolar testified that after six months and twenty days of treatment, he learned that he had problems dealing with vulnerable women and recognized that he was, in fact, a sexual abuser. He admitted that he developed bonds of love, trust, and admiration with certain female parishioners, only to manipulate and/or sexually abuse them later. When asked, "Do you acknowledge at this point that all of these relationships, whether prolonged or single instances, do constitute sexual abuse?" Father Kolar responded, "Yes."

Appellants brought this action against Father Kolar, the Archdiocese of St. Paul and Minneapolis, the CYC, and James Kolar. This action sounds in negligence; ABC makes no claim of fraud. Upon cross-motions for summary judgment, the district court dismissed appellants' complaint. Upon motion to reconsider, appellants submitted to the district court four supplemental letters in response to the district court's order for summary judgment.[1] The trial court denied the motion and ordered judgment for respondents.

1. These letters were from two priests and two therapists who had already offered evidence in support of ABC's case pending summary judgment. "The record does not remain open for the submission of new evidence after the trial court makes its order granting summary judgment." *Midway Nat'l Bank of St. Paul v. Bollmeier*, 462 N.W.2d 401, 404 (Minn.App.1990), *aff'd*, 474 N.W.2d 335 (Minn.1991). Thus, the documents which appellants submitted upon motion for re-

## ISSUE

Did ABC have "reason to know," prior to 1985, that Father Kolar had sexually abused her and caused her injury?

## ANALYSIS

■■■ On appeal from summary judgment, we consider whether any issues of material fact exist and whether the district court erred in its application of the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). We review the district court's interpretation of law de novo. *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 190 (Minn. 1990).

An action for damages based on personal injury caused by sexual abuse must be commenced within six years of the time the plaintiff knew or had reason to know that the injury was caused by the sexual abuse.

Minn.Stat. § 541.073, subd. 2(a) (1992). Under this law, known as the "delayed discovery" rule, the statute of limitations begins running when a plaintiff knows or has reason to know that an injury was caused by sexual abuse, rather than beginning when the actual abuse occurred. *H.D. v. White*, 483 N.W.2d 501, 502 (Minn.App.1992).

Minnesota courts have only addressed the "delayed discovery" statute of limitations twice. *See id.; K.E. v. Hoffman*, 452 N.W.2d 509, 511 (Minn.App.1990), *pet. for rev. denied* (Minn. May 7, 1990). The victim in *H.D.* "knew he had been injured by the alleged sexual misconduct of the [defendant] seven years prior" to filing suit. *H.D.*, 483 N.W.2d at 502. This court held that the 1991 version of the statute did not revive the victim's time-barred claims against the defendants. *Id.* at 503. The victim in *K.E.*, however, suffered traumatic amnesia as a child and

consideration are not properly part of the district court record or our record on appeal. *See Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn.1988) (our review limited to district court record); *see also In re Nelson*, 495 N.W.2d 200, 204 (Minn. 1993) (letter sent to district court after judgment was not part of record on review). For these reasons, the letters have played no part in our consideration or decision of this case.

was unable to remember the abuse until his memories resurfaced as an adult. *K.E.*, 452 N.W.2d at 511. Because the victim's case was pending at the time of the statutory amendment at issue there, this court allowed the victim to proceed to trial. *Id.* at 515.

ABC argues that not until 1990 was she able to see the situation clearly and recognize that she had been a victim of abuse. Thus, she contends that her statute of limitations began running in 1990 when she came to realize that her relationship with Father Kolar actually had amounted to 11 years of sexual abuse. We cannot agree. Unlike K.E., ABC did not suffer from a repressed memory that was reawakened in 1990. On the contrary, ABC vividly retained every detail of Father Kolar's conduct and its effect on her: her anxiety, her depression, and her troubled mind over her relationship with a Catholic priest. Except for her minority during the early years of their relationship, ABC had no other disability. ABC is asking the court to apply a subjective standard, based upon her own mental and emotional state, in order to determine whether ABC "should have known" that she had been a victim of sexual abuse. Such a standard has no basis in law. ABC's inability to comprehend that her situation had been abusive does not toll the statute of limitations. We hold that the case should be viewed under an objective standard: whether a reasonable person in ABC's situation "should have known" of the abuse. The conduct of both Kolar and appellant should be considered in that light.

ABC argues that whether or not she had reason to know of the abuse is a question of fact for jury determination. In some contexts that rule stands. *See, e.g., Wittmer v. Ruegemer*, 419 N.W.2d 493, 498 (Minn.1988) (where plaintiff contended fraudulent concealment delayed discovery of defective condition, question of when plaintiff discovered or should have discovered defective condition was issue for trier of fact to determine); *K.E.*, 452 N.W.2d at 515 (case remanded for determination where trial court had not yet considered whether victim should reasonably have known). In this case, however, we have the district court, and now this appellate court, examining the evidence presented in order to determine whether a material fact exists for trial. The district court found, and we concur, that no material issue of fact exists over whether ABC had reason to know prior to 1985 that she had been abused. The record establishes conclusively that she had reason to know and leaves no question for jury determination.

The trial court listed the following evidence to support its conclusion that ABC should have known prior to 1985 that she had been a victim of sexual abuse:

1. ABC was aware that priests were unable to marry and must remain celibate. She knew that their relationship violated these rules and therefore she tried to keep their relationship secret;

2. ABC frequently cried after sexual relations or out of town trips with Michael Kolar because she was struggling with the situation;

3. In 1977 and 1979, ABC discussed her relationship with Michael Kolar with Ann Kolar, Michael Kolar's sister-in-law;

4. In 1977, ABC discussed her relationship on at least four occasions with Father Tim Power, her parish priest and friend;

5. In 1978, ABC discussed her relationship with KB, a friend of hers and the Kolar family;

6. Between 1978–79, ABC discussed her relationship with Father Greg Skrypek, Michael Kolar's friend, because she was feeling trapped;

7. ABC suffered a miscarriage in 1982 due to a pregnancy by Michael Kolar;

8. In 1982 and 1983, ABC sought counseling with Virgil Burns, a therapist, to discuss her relationship with Michael Kolar. The first time ABC went to see Virgil Burns, Michael Kolar accompanied her and ABC discussed the trauma she suffered in 1982 as a result of her miscarriage;

9. In August of 1983, [ABC] explained her relationship with Michael Kolar to her current husband, XYZ;

10. Again in August of 1983 [ABC] explained her relationship with Michael Kolar to her current husband, XYZ, in more detail, crying and grieving. It appeared to XYZ that ABC was sad about the relationship ending and Michael Kolar choosing the priesthood and all of the years that had gone by;

11. During the fall of 1983, ABC told XYZ that she was attending counseling sessions with Virgil Burns because she was experiencing sadness as a result of her relationship with Michael Kolar and the miscarriage. XYZ accompanied ABC during these counseling sessions for the purpose of understanding and discussing what happened to ABC and the effect of her relationship with Michael Kolar on both plaintiffs' lives;

12. ABC lost faith in her religion after her relationship with Michael Kolar;

13. ABC's relationships with family and friends suffered due to her relationship with Michael Kolar;

14. ABC has suffered from anxiety and depression due to her relationship with Michael Kolar and suffered during the summer of 1982;

15. In 1985, XYZ complained to the bishop regarding Michael Kolar's relationship with ABC; and

16. XYZ confronted Michael Kolar about his relationship with ABC.

This evidence establishes overwhelmingly that, under a reasonable person standard, ABC should have known prior to 1985 that she had been abused as a minor and as an adult. *See* Minn.Stat. §§ 609.343, subd. 1(b), (g), (h)(iii) (1992) (sexual contact; victim under 16; accused in position of authority; significant relationship with accused; multiple acts over extended period); 609.344, subd. 1(e), (f), (g)(ii), (i) (1992) (sexual penetration; victim under 18; accused in position of authority; significant relationship with accused; personal injury; therapy setting, emotionally dependent victim); 609.345, subd. 1(e), (f), (g)(ii), (g)(iii) (1992) (sexual contact; victim under 18; accused in position of authority; significant relationship with accused; person-al injury; multiple acts); 609.341, subds. 17, 19 (1992) (clergy included in definition of therapist; "emotionally dependent" defined).

Other states have barred actions for sexual abuse by allowing the statute of limitations to begin running at the time the victim reached majority when the victim was aware of the wrongful conduct and the harm incurred. *See Cassidy v. Smith,* 817 P.2d 555, 556–57 (Colo.Ct.App.1991) (action barred when victims sought to bring action 12 and 15 years after they reached majority), *cert. denied,* (Colo. Sept. 16, 1991). Similarly, the Oklahoma court held the delayed discovery rule did not extend the statute of limitations 18 years after the allegedly abusive relationship terminated because the victim was " 'chargeable with knowledge of facts which [she] ought to have discovered in the exercise of reasonable diligence.' " *Lovelace v. Keohane,* 831 P.2d 624, 630 (Okla.1992) (quoting *Daugherty v. Farmers Coop. Ass'n,* 689 P.2d 947, 951 (Okla.1984)).

In the present case, ABC was 26 when Father Kolar terminated their relationship in 1983. Eight years passed between the end of their relationship and the commencement of this lawsuit. During that time, ABC married XYZ and had children. It is unreasonable to suggest that ABC never realized the true nature of this abusive relationship even though she had known that the relationship was wrong from the outset and she had struggled emotionally and physically for so long. In 1990, when ABC learned about JB, she may have suffered emotionally after the disclosure of Father Kolar's involvement with someone else, but that discovery did not constitute sexual abuse as that term is defined by the statute, nor did that discovery toll the negligence statute of limitations; as we have already observed, appellants make no claim of fraud. To recognize a subjective standard and allow this case to go to trial would open the floodgates to suits long since time-barred.

■ We note for the record that XYZ's claim for loss of consortium is derivative of ABC's tort claims. *See Kohler v. Fletcher,* 442 N.W.2d 169, 173 (Minn.App.1989), *pet. for rev. denied* (Minn. Aug. 25, 1989). Thus,

because ABC's claim has failed, XYZ's claim also fails.  *Id.*

In its well-reasoned memorandum explaining its rationale in this case, the district court set out one of the most compelling reasons why this action is time-barred and why ABC had reason to know she had been abused:

> [T]he strongest evidence that ABC knew or had reason to know that she had been injured by "sexual abuse" (in this case because of either ABC's age or of Father Kolar's position) stems from her pregnancy and related occurrences.  ABC's pregnancy, efforts to conceal it and subsequent miscarriage were clearly injuries caused by "sexual abuse," the memory of which was not repressed by ABC.  When these incidents are considered, along with the other factors mentioned in the court's previous memorandum, there is no doubt in the court's mind that ABC had reason to know before 1985 that she had been sexually abused by Kolar.

No one in good conscience could condone Father Michael Kolar's actions in this case, but this civil suit is barred by the passage of time.

## DECISION

The district court applied the proper standard when determining whether ABC had reason to know that Father Michael Kolar had sexually abused her and caused her injuries.  Based on an objective, reasonable person standard, the overwhelming facts establish that ABC had reason to know prior to 1985 that she had been a victim of sexual abuse.  Thus, her cause of action expired before she brought this action in 1991.  Because ABC's claim has failed, XYZ's derivative claim for loss of consortium also fails.  The trial court properly entered summary judgment for respondents.

**Affirmed.**