**Mary ROE, et al., Appellants,**

v.

**ARCHDIOCESE OF ST. PAUL AND MINNEAPOLIS, et al., Gerald (Jerry) Piche, Respondents.**

No. C5–93–2519.

Court of Appeals of Minnesota.

June 28, 1994.

Review Denied Aug. 24, 1994.

John L. Weyland, Wayzata, for appellant.

Thomas B. Wieser, St. Paul, for Archdiocese of St. Paul and Minneapolis, et al.

Theodore J. Collins, Thomas E. McEllistrem, St. Paul, for Gerald (Jerry) Piche.

Considered and decided by
KALITOWSKI, P.J., and RANDALL and
AMUNDSON, JJ.

## OPINION

KALITOWSKI, Judge.

Appellants seek review of the district court's grant of summary judgment in favor of respondents, contending the district court erred in concluding that their claims against respondents are barred by the statute of limitations.

## FACTS

In February 1982, appellant, identified in the district court as Mary Roe (Roe), began counseling sessions with her parish priest, respondent Gerald Piche, at respondent The Church of St. Timothy (the church). In June 1982, Roe, then 17 years old, moved into the convent house adjacent to the church due to conflicts in her foster home. Roe remained at the convent house until August 1982 and stayed there again from May 1984 to February 1985.

Shortly after Roe's 18th birthday on July 31, 1982, her relationship with Piche became sexual. Although Roe moved out of the convent house in August 1982, Roe and Piche continued their sexual relationship. Throughout their relationship, Roe admitted feeling uncomfortable about their sexual relationship, as evidenced by numerous facts: (1) Roe knew Piche should remain celibate, which caused Roe to feel uncomfortable about the relationship; (2) Roe sent a letter to Piche stating that their relationship was a "dead-end street"; (3) Roe went to confession on several occasions and expressed her concern to Piche over their sexual relationship; (4) Roe disclosed her relationship with Piche to a close friend and had numerous discussions with her friend about the relationship; (5) on one occasion, Roe and her friend confronted Piche about the relationship, after which Roe interpreted Piche's response as an admission that their relationship was wrong; and (6) Roe disclosed the relationship to a Christian Brother.

In May 1984, Roe moved back into the convent house. During the summer of 1984, appellant observed that Piche was spending time with another woman, whom Piche subsequently married. After learning that Piche was romantically involved with the other woman, Roe became angry and questioned Piche's judgment, morals, and values. Roe testified in her deposition that the counseling relationship with Piche ended in August 1984 and the sexual relationship with Piche stopped by the end of 1984. Roe indicated that she felt "used by him and abused by him at that point." During this period, Roe lost interest in Piche and "began just knowing it was wrong." Roe also lost faith in the

church, stopped attending mass, and stopped going to confession.

During the fall of 1984, Roe was involved in a relationship with R.M. Roe disclosed her relationship with Piche to R.M., who immediately broke off their relationship. Roe believes R.M. ended the relationship because of her disclosure about Piche. Because Roe believed her relationship with Piche was wrong, she felt that R.M. "had every reason to abandon" her. In February 1985, while at the convent house, Roe attempted to commit suicide with a razor blade because she felt abandoned by Piche.

In April 1985, Roe moved to Arizona to live with her mother. Roe admitted that she left Minnesota "to get away from [Piche] and the situation with him." While in Arizona, Roe met and subsequently married appellant John Roe. Mary Roe did not disclose her relationship with Piche to John Roe before their marriage. According to Roe, she did not think about or talk about her relationship with Piche during the time she lived in Arizona.

In August 1988, appellants moved back to Minnesota. Shortly thereafter, in October 1988, Roe's memories of her relationship with Piche began to resurface. During this period, Roe suffered psychological problems, including suicidal ideation and self-mutilation.

In July 1992, Roe viewed a television news program addressing sexual misconduct by clergy. Shortly thereafter, Roe sought professional help from Ellen Luepker, a psychologist. In Luepker's professional opinion, Roe suppressed her memory of her relationship with Piche while in Arizona but the news program caused Roe to link her psychological problems to her relationship with Piche.

On July 31, 1992, Roe filed a complaint against respondents. Mary Roe alleged assault, breach of fiduciary duty, and negligent counseling against Piche, and respondeat superior and negligent placement or supervision against the church and the Archdiocese of Saint Paul and Minneapolis (the Archdiocese). John Roe alleged loss of consortium against all respondents. The district court granted summary judgment in favor of respondents, concluding that appellants' claims were barred by the statute of limitations because Mary Roe "knew or had reason to know," in February 1985, that the sexual abuse caused her injuries.

## ISSUE

Did the district court err in concluding that appellants' claims are barred by the statute of limitations?

## ANALYSIS

Appellants contend the district court erred in concluding that their claims against respondents are barred by the statute of limitations. We disagree.

On appeal from summary judgment, we must determine: (1) whether there are any genuine issues of material fact; and (2) whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). The construction of a statute is a question of law that we review de novo. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.,* 369 N.W.2d 527, 529 (Minn.1985).

The applicable statute of limitations provides, in part, that:

> An action for damages based on personal injury caused by sexual abuse must be commenced within six years of the time the plaintiff knew or had reason to know that the injury was caused by the sexual abuse.

Minn.Stat. § 541.073, subd. 2(a) (1992). This statute applies to all actions pending on, or commenced on or after, May 20, 1989. 1989 Minn.Laws ch. 190, § 6. Under this statute, known as the "delayed discovery" rule, the limitations period begins to run when the plaintiff knows or has reason to know that an injury was caused by sexual abuse, rather than when the abuse actually occurred. *H.D. v. White,* 483 N.W.2d 501, 502 (Minn. App.1992). Because the district court applied Minn.Stat. § 541.073 without addressing respondents' argument that the relationship between Roe and Piche did not constitute sexual abuse within the meaning of the statute, we likewise assume, without deciding, that Piche's conduct constituted sexual abuse.

■ This court has recently decided a similar case involving alleged sexual abuse by a priest and the applicability of Minn.Stat. § 541.073. *See ABC & XYZ v. Archdiocese of St. Paul & Minneapolis*, 513 N.W.2d 482 (Minn.App.1994). In *ABC*, the victim, a minor at the time of the sexual abuse, alleged that her relationship with the defendant progressed from counseling to physical contact to sexual relations. *Id.* at 483–84. The relationship ended in 1983. *Id.* at 484. The victim brought an action in 1991, contending she did not recognize that she had been a victim of abuse until 1990. *Id.* at 483. In dismissing the victim's action, this court applied an objective standard: "whether a reasonable person in [the victim's] situation 'should have known' of the abuse." *Id.* at 486. This court concluded that no material issue of fact existed as to whether the victim had reason to know, prior to 1985, that she had been sexually abused because the evidence overwhelmingly indicated that a reasonable person should have had such knowledge. *Id.* The evidence included, in part, that: (1) the victim was aware that priests were unable to marry and should remain celibate, knew that their relationship violated these rules, and thus tried to keep the relationship secret; (2) the victim frequently cried after sexual relations with the defendant because she was struggling with the situation; (3) the victim discussed her relationship with several other people, including another member of the clergy; (4) the victim disclosed the relationship to a person she was dating; (5) the victim admitted feeling sadness resulting from the relationship; (6) the victim lost faith in her religion after the relationship ended; and (7) the victim suffered from anxiety and depression due to the relationship. *Id.* at 486–87.

■ The record demonstrates that all of the above circumstances cited by *ABC* are present here. In addition, Roe: (1) admitted feeling "used" and "abused" by Piche after the relationship ended; (2) attempted to commit suicide in February 1985 because she felt abandoned by Piche; and (3) moved to Arizona in April 1985 to get away from Piche. On this record, no genuine issue of material fact exists as to whether a reasonable person in Roe's situation should have known, no

later than April 1985, that the injuries were caused by sexual abuse. *See id.* at 487.

■ Appellants contend *ABC* is inapplicable because the victim in *ABC* did not suffer from repressed memory. We disagree. The plain language of the statute delays the beginning of the limitations period until a person "knew or had reason to know that the injury was caused by the sexual abuse." Minn.Stat. § 541.073. The statute does not provide that the limitations period is tolled if an adult victim subsequently suppresses memories of sexual abuse. Further, we note that if the legislature intended to draft such a tolling statute, it could have done so. *See* Minn.Stat. § 541.15 (1992) (certain enumerated disabilities "shall suspend the running of the period of limitation until the same is removed"). Thus, we conclude that, even if Roe suppressed her memory of the abuse while in Arizona, the limitations period began to run no later than April 1985 and was not tolled while Roe lived in Arizona.

Appellants further contend that it contravenes legislative intent for this court to consider evidence that Roe was aware of the sexual abuse during the course of the relationship. We need not consider legislative intent, however, because the following evidence indicates that Roe knew of her injury after the relationship ended in late 1984: (1) Roe attempted to commit suicide in February 1985 because she felt abandoned by Piche; and (2) Roe moved to Arizona in April 1985 to get away from Piche. This evidence demonstrates that no genuine issue of material fact exists as to whether Roe should have known, no later than April 1985, that her injuries had been caused by sexual abuse.

Mary Roe's claims of respondeat superior and negligent placement, retention, and/or supervision against the church and the Archdiocese also fail. *See* Minn.Stat. § 541.073, subd. 3 (applying statute to actions for damages against a person who causes the plaintiff's personal injury by negligently permitting sexual abuse against the plaintiff to occur); *H.D.*, 483 N.W.2d at 503–04 (recognizing that Minn.Stat. § 541.073 applies a six-year limitations period to both negligence and intentional tort claims). Finally, we con-

clude the district court properly dismissed John Roe's loss of consortium claim and the claims against the church and the Archdiocese. John Roe's loss of consortium claim is derivative of Mary Roe's claims and thus fails because Mary Roe's claims have failed. *ABC,* 513 N.W.2d at 487–88 n. 5.

## DECISION

The district court properly granted summary judgment in favor of respondents because appellants' claims are barred by the statute of limitations.

**Affirmed.**

AMUNDSON, Judge (concurring specially).

I reluctantly concur in the majority's result but write separately to express my concern that in many sexual abuse situations, this statutory provision will be difficult to apply, or it simply will not apply at all based on a plain language reading of the provision.

For example, suppose that a child is sexually abused by a parent beginning at age 16 and continues until 20. As a result of the abuse, the child feels guilt, shame and helplessness. When the abuse stops, the child still feels the guilt, shame and helplessness for a short while, but soon completely represses the memories of the abuse until age 28. Because such person was aware of the fact of the sexual acts as well as their wrongfulness, the statute would begin running at age 20. Since, however, the statute does not provide for a suspension of the statute of limitations once it has begun to run, the claim would be barred. Thus, a victim in this situation is faced with two choices: to bring a claim shortly after the abuse ends, which for many abuse victims will be extremely difficult, or to bring a claim during the period they repressed the memory, an impossibility, of course.

As appellant argues, it is only logical that repression of the memories of sexual abuse would occur after the abuse ended. In such a situation, however, if the victim was aware of the fact of the abuse and its wrongfulness after the last abusive incident, then the statute of limitation begins to run. It would

make no difference that the victim had completely repressed the memories for more than 6 years, because the statute of limitation is moving inexorably. The result is troubling and we make them double victims of the abuse. First, by the wrongdoer, then by legislative fiat. For too many victims this statute may be of little or no use.