**K.B., Appellant,**

v.

**EVANGELICAL LUTHERAN CHURCH IN AMERICA f/k/a Lutheran Church in America, et al., First Lutheran Church, Reverend Donald Clayton Olson, Respondents.**

**No. C4–95–782.**

Court of Appeals of Minnesota.

Oct. 10, 1995.

Jeffrey R. Anderson, Barbara J. Felt, Reinhardt and Anderson, St. Paul, for K.B.

Patrick J. Schiltz, Ronald J. Lee, Faegre & Benson, Minneapolis, for Evangelical Lutheran Church in America.

Karl L. Cambronne, Sandra McGoldrick–Kendall, Chestnut & Brooks, P.A., Minneapolis, for First Lutheran Church.

William D. Flaskamp, Leatha G. Wolter, Richard L. Pemberton, Jr., Meagher & Geer, Minneapolis, for Olson.

Considered and decided by HUSPENI, P.J., and AMUNDSON and THOREEN*, JJ.

## OPINION

JOHN F. THOREEN, Judge.

Appellant K.B. appeals from the district court's dismissal by summary judgment of

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

her personal injury action based on alleged past sexual abuse by respondent Olson. Appellant argues that the district court misapplied the delayed discovery statute of limitations for sexual abuse. We affirm.

## FACTS

K.B. is a forty-two year old married mother of three. Donald Olson (Olson) was appellant's former Sunday school teacher and pastor at First Lutheran Church (First Lutheran) from 1966 to 1972.

Olson began working for First Lutheran in February 1966 as a seminarian. Olson's duties included youth work, liturgy, some preaching, hospital calling, teaching Sunday school, and working at a summer camp. Olson became an associate pastor at First Lutheran after graduation in 1966, and he remained there until 1972.

K.B. and Olson met in 1966, when K.B. was in eighth grade and Olson taught her confirmation class. Olson was also in charge of a youth group in which K.B. was very active. K.B. also sought counseling with Olson for family problems. Olson asked K.B. to participate in a sexuality "survey" involving young members of the congregation. Olson had K.B.'s parents sign a permission slip allowing her to participate in group and individual discussions regarding sexual issues and to see an "R"-rated movie. Ten to fifteen youths participated. K.B. attended individual sessions on a weekly basis when she was 14.

During these sessions, Olson initiated sexual touching. Olson asked K.B. many questions about sex, including how the touching made her feel. The sexual contact continued on a weekly basis and eventually escalated to digital penetration. Each time, Olson asked K.B. how the touching made her feel. Olson also placed K.B.'s hands inside his pants to touch his penis. On several occasions, Olson removed K.B.'s clothing, took instant pictures and showed them to her, and then disposed of them.

The sexual contact occurred in Olson's church office, the church basement, Olson's home, and at summer camp. Olson told K.B. that their relationship was special and they had to keep it secret. K.B. states that she did not tell anyone about the touching because she really cared for Olson, felt loved by him, and even thought of marrying him.

The sexual contact decreased in frequency during K.B.'s junior and senior years of high school. During this time, she saw Olson with another girl, S.G. K.B. saw Olson and S.G. go into his office a number of times, and saw him picking S.G. up at school. K.B. was hurt when things started to slow down between them and knew it was because Olson was with someone else.

The last sexual contact occurred in May 1972, when K.B. was 18. K.B. was at Olson's home when he received a call offering him a job in Colorado. Olson's wife and son were also present. K.B. began to cry when Olson was offered the job. He took her into his bedroom and they had intercourse. This was the only time that intercourse occurred.

In the fall of 1972, when K.B. was 19, she told S.G. that Olson had been "with" other girls. S.G. became angry and called Olson in Colorado. Olson yelled at K.B. on the telephone, accusing her of spreading lies about him and stating that when he returned to Minnesota on an upcoming scheduled visit, he would "kick [her] butt from one end of the island to the other" if she was not the first person he saw when he arrived.

K.B. was frightened and confused by Olson's statements. She went to the camp manager, Gary Cummings, and told him about the sexual contact and pictures, but did not tell him about having intercourse the previous spring. Cummings was "shocked" and K.B. was "fairly upset."

Olson met with both K.B. and S.G. a few days later. Olson and S.G. told K.B. that their relationship was "special." K.B. felt sad, she experienced a sense of loss, and she did not see Olson after the incident.

K.B. married in 1977. She did not think about the abuse or talk to anyone about it, except for making short references about it to her husband, until 1987.

In 1986, K.B. began experiencing mood swings and depression. On July 25, 1986, her family physician noted suicidal ideation. In August 1987, she was referred to an eat-

ing disorders program. On October 9, 1987, in a therapy session, she told Dione Larson, R.N., about the sexual contact she experienced with Olson. The therapist's notes recount:

[K.B.] talked about the Lutheran minister, who, when she was 12 yrs. old, asked her parents and others to take the children to an R rated movie. From that, he isolated [her] into 1:1 counseling where he touched her breasts and took provocative nude pictures of her. Then he forced oral sex. [K.B.] believes that this happened to 3 or 4 other girls as well but that no one talked. The minister was highly respected. A few years later suspicions were aroused and he left town when the heat was on. [K.B.] never told anyone, other than bits and pieces to her husband. She's been thinking about it more lately [?] to her own children getting older. [Assessment:] Will need additional 1:1s and support to discuss the sexual abuse she experienced.

The record is unclear whether K.B. discussed the abuse with anyone else after this disclosure. There are no other therapist notes on this topic in the record. K.B. was receiving treatment from a psychiatrist and participating in group therapy in addition to the sessions with the therapist. There are no notes in the record from the psychiatrist or from group therapy.

K.B.'s condition deteriorated until she was hospitalized on August 23, 1988, for major depression and anorexia. Her intake interview on August 24, 1988, notes:

She reports a sexual abuse incident or incidents that occurred when she was about 13 with her Lutheran pastor. The person responsible for the abuse was a seminarian at the time this happened and was able to cover his abusive acts with teenagers by having parents sign permission slips for a research study into teenagers' attitudes toward sexuality. She feels that she has worked through the issue of the sexual abuse by talking about it with her psychiatrist and therapist within the last year. [K.B.] sees her eating disorder as an issue of control and feels that her life has been out of control and controlled by others for her lifetime.

K.B. states in her affidavit that she first began to understand that her problems were caused by the abuse after inpatient counseling began in August 1988.

K.B. initiated a lawsuit in December 1993, seeking damages for injuries allegedly caused by respondents Olson, First Lutheran, Evangelical Lutheran Church in America (ELCA), and St. Paul Area Synod. The complaint alleged sexual battery, breach of fiduciary duty, vicarious liability and negligence that allegedly occurred between 1966 and 1972.

In 1994, after the lawsuit was served, K.B. was evaluated by Dr. Carol E. Novak, a licensed psychiatrist. Dr. Novak testified that she has extensive experience in treating victims of sexual abuse, including individuals who have been victimized by adult authority figures. Dr. Novak testified about the symptoms and injuries experienced by such victims. She also discussed how these symptoms and injuries are more pronounced where the victim is a child or young adult at the time of the abuse and where the perpetrator is in a position of trust and authority.

Dr. Novak noted that as a result of the immense disparity of knowledge and power, and because of the trust that the victim has in the perpetrator, victims of sexual abuse, such as K.B., often suffer from confusion, guilt and self-blame, which preclude them from realizing that they have been victimized by the trusting adult authority figure.

Dr. Novak concluded that K.B.'s inability to understand that she was sexually abused or that she had suffered injuries as a result of the sexual abuse was "quite typical of victims under these circumstances."

Dr. Novak testified that K.B. did not start to realize until after August 1988 that she had been sexually abused by Olson or that she suffered injuries as a result of that abuse. In Dr. Novak's opinion, the October 9, 1987, therapist's note was not an indication that K.B. knew she was abused or that she was injured as a result of the abuse.

Respondents moved for summary judgment on all counts, contending the claims were barred by the statute of limitations set

out in Minn.Stat. § 541.073. The trial court granted summary judgment, ruling that "under an objective standard, [K.B.] had reason to know by October 1987 [more than six years before K.B. commenced the lawsuit] that her injuries had been caused by Olson's sexual abuse of her."

On appeal, K.B. argues she did not know and should not have known prior to August 1988 that her injuries were caused by the sexual abuse.

## ISSUE

Did the district court err in ruling as a matter of law that K.B.'s claim is time-barred because she had reason to know by October 1987 that she was abused and that her injuries were caused by respondent Olson's sexual abuse?

## ANALYSIS

■ Summary judgment may be granted "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn.R.Civ.P. 56.03. The reviewing court must determine (1) whether there are any genuine issues of material fact, and (2) whether the district court erred in applying the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn. 1990). In doing so, we view the evidence in the light most favorable to the party against whom summary judgment was granted, and accept as true the factual allegations produced by the non-movant. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). The construction of a statute is a question of law that we review de novo. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.,* 369 N.W.2d 527, 529 (Minn.1985).

■ The delayed discovery statute provides that

[a]n action for damages based on personal injury caused by sexual abuse must be commenced within six years of the time the plaintiff knew or had reason to know that the injury was caused by the sexual abuse.

Minn.Stat. § 541.073, subd. 2(a) (1992). The statute is analyzed under a two-part objective test. *See ABC v. Archdiocese of St. Paul & Minneapolis,* 513 N.W.2d 482, 486 (Minn.App.1994). The limitations period begins to run when a reasonable person in the claimant's situation should have known (1) that she was sexually abused and (2) that her injuries were caused by the sexual abuse. *See id.*

Summary judgment is appropriate if "[t]he record establishes conclusively that [the plaintiff] had reason to know and leaves no question for jury determination." *Id.* at 486. The record shows the sexual abuse occurred from 1966–72. K.B. served her summons and complaint on respondent St. Paul Area Synod on December 9, 1993. Thus, summary judgment was appropriate if, as a matter of law, a reasonable person in K.B.'s situation should have known prior to December 9, 1987, that she was abused and that the sexual abuse caused her injuries.

*Knowledge of Abuse Test*

■ K.B. argues she did not know and should not have known until sometime after August 1988 that she was abused. We disagree. This is not a repressed memory case. K.B. never forgot about the abuse and even told her husband "bits and pieces" throughout the years. K.B. was 18 when she and Olson had intercourse and 19 when the relationship ended. K.B. testified she felt sad and had a sense of loss when the relationship ended. K.B. told the camp manager the details of her relationship with Olson, except the intercourse. A reasonable person in K.B.'s situation should have known that she had been abused. *See, e.g., Roe v. Archdiocese of St. Paul & Minneapolis,* 518 N.W.2d 629, 632 (Minn.App.1994) (holding that victim should have known she was abused where victim was between 18 and 20 years old at time of abuse), *review denied* (Minn. Aug. 24, 1994); *ABC,* 513 N.W.2d at 486–87 (holding that victim should have known she had been abused where victim was between 15 and 26 years old at time of abuse).

K.B.'s statements to the therapist in 1987 demonstrate her awareness of the abuse. She stated that Olson "*forced* oral sex" and that when "suspicions were aroused * * * he

*left town when the heat was on."* (Emphasis added.) These words indicate K.B. understood the significance of the events and their moral character. The district court's determination that K.B. knew, or that a reasonable person using the same words K.B. used to describe a similar situation would have known she had been the victim of abuse, is supported by the record. That interpretation of K.B.'s understanding is corroborated by statements made in the 1988 intake interview, when K.B. said that she had "worked through" the issue of sexual abuse in 1987.

K.B. argues that Dr. Novak's testimony establishes that she did not know in 1987 that she was the victim of abuse, despite the statement made to the therapist. We disagree. Dr. Novak's opinion incorporated a subjective "victim's" standard, which is inconsistent with the objective "reasonable person" standard of the statute.[1] *S.E. v. Shattuck–St. Mary's Sch.,* 533 N.W.2d 628, 631–32 (Minn.App.1995), *review denied* (Minn. Aug. 30, 1995). On the record before us, a reasonable person in K.B.'s situation should have known that she had been abused before December 9, 1987.

*Injuries Caused by Abuse Test*

K.B. argues she did not know and should not have known until sometime after August 1988 that her injuries were caused by the sexual abuse. We disagree. K.B.'s discussion of the abuse during the treatment session shows that she made the connection between her injuries and the abuse. In 1987, K.B. was treating with her therapist for a serious eating disorder and depression. K.B. told her therapist about the abuse in the context of determining and treating the causes of these problems. It is not possible that a reasonable person in her situation would discuss past instances of sexual abuse during a treatment session for severe psychological problems without understanding at some level that the past incidents had some connection to her current situation. We believe a reasonable person in K.B.'s situation should have known in 1987 that her injuries were caused by the sexual abuse.

K.B. argues that her injuries were "intangible," as in *Blackowiak, M.L.,* and *Doe,*[2] and therefore less easily identified until some triggering event made the connection to the abuse possible. We disagree. K.B. had been suffering from her psychological problems for a number of years before August 1988. She received treatment from various doctors, beginning in 1986, for these problems. In 1987, she stated that she had been thinking more about the incidents with Olson and the therapist indicated that K.B. should continue to discuss the abuse in further

1. We note the emerging conflict in the psychiatric community over the validity of discovered memories of sexual abuse. *See, e.g.,* Christina Bannon, comment, *Recovered Memories of Childhood Sexual Abuse: Should the Courts Get Involved When Mental Health Professionals Disagree?,* 26 Ariz.St.L.J. 835, 836–40 (1994) (discussing the conflict in the fields of psychiatry and psychology over the prevalence of false or "augmented" memories of sexual abuse created by questionable psychiatric methods); Mark Mac-Namara, *Fade Away: The Rise and Fall of the Repressed–Memory Theory in the Courtroom,* Cal. Law., Mar. 1995, at 36, 36, 38 (noting that many experts argue the lack of empirical evidence from reputable scientific studies disputes many of the claims made in favor of recovered memories of sexual abuse).

We also note that the emerging conflict impacts on the admissibility of expert opinions. In *State v. Anderson,* 379 N.W.2d 70, 79 (Minn. 1985), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986), the court, using the standard set forth in *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923), refused to accept an

expert opinion of a personality assessment based on "graphology" because the scientific technique on which the expert testimony was based was not scientifically reliable and not broadly accepted in its field. *See Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, —— – ——, 113 S.Ct. 2786, 2792–2798, 125 L.Ed.2d 469 (1993) (modifying *Frye* ).

2. *Blackowiak v. Kemp,* 528 N.W.2d 247, 252 (Minn.App.1995) (noting that Blackowiak's injuries were not as readily apparent because they were less tangible behavioral problems, like alcoholism, lack of self-worth, and an inability to maintain relationships, that manifest themselves "gradually" after the abuse ends), *review granted* (Minn. Apr. 27, 1995); *M.L. v. Magnuson,* 531 N.W.2d 849, 856 (Minn.App.1995) (noting that M.L.'s injuries were "intangible behavioral problems" like those in *Blackowiak*), *review denied* (Minn. July 20, 1995); *Doe v. Redeemer Lutheran Church,* 531 N.W.2d 897, 901 (Minn.App.1995) (holding that Doe's injuries of alcoholism, social phobia, and depression were like those in *Blackowiak*), *review granted* (Minn. July 20, 1995).

treatments. By August 1988, K.B. said she had "worked through" the issue of abuse with her psychiatrist and therapist. It is clear that her injuries were "tangible" enough for a reasonable person in her situation to make a connection between them and the abuse.

## DECISION

The evidence clearly shows that K.B. knew or should have known before December 9, 1987, that she had been abused and that her injuries were caused by the sexual abuse. The district court properly granted summary judgment in favor of respondents because K.B.'s claims were barred by the statute of limitations.

**Affirmed.**

AMUNDSON, Judge (dissenting).

I respectfully dissent. Once again I am compelled by conscience on this issue. Earlier, I noted, regretfully, that:

As appellant argues, it is only logical that repression of the memories of sexual abuse would occur after the abuse ended. In such a situation, however, if the victim was aware of the fact of abuse and its wrongfulness after the last abusive incident, then the statute of limitation begins to run. It would make no difference that the victim had completely repressed the memories for more than 6 years, because the statute of limitation is moving inexorably. The result is troubling and we make them double victims of the abuse. First, by the wrongdoer, then by legislative fiat. For too many victims this statute may be of little or no use.

*Roe v. Archdiocese of St. Paul & Minneapolis*, 518 N.W.2d 629, 633 (Minn.App.1994) (Amundson, J., concurring), *review denied* (Minn. Aug. 24, 1994).

The issue demands consideration in the broader context of what we know about memory and psychology. Psychologists and psychotherapists are in disagreement about the phenomenon of repressed memories and the effects of sexual abuse. If such experts are in disagreement over these issues, how can we say as a matter of law that a "reasonable [lay]person" would know that emotional problems occurring long after the abuse were caused by that abuse?

As I said, it is conscience which calls me to dissent. And I recall vividly being taught the virtues of fidelity to conscience. Perhaps these parties will understand that better than any others. My lesson comes from a 16th century monk who truculently defied all known religious and secular authorities of the time when he declared:

Unless I am proved wrong * * * by right reason I cannot recant. To do so would require me to offend my conscience, and to do that is neither wise nor safe. Here I stand; I cannot do otherwise.

Martin Luther, Diet of Worms
April 18, 1521