Mary RYAN et al.

v.

ROMAN CATHOLIC BISHOP
OF PROVIDENCE et al.

No. 2004–49–Appeal.

Supreme Court of Rhode Island.

Feb. 8, 2008.

Mary Ryan, pro se.

Thomas R. Bender, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The plaintiffs, Mary Ryan and Thomas Ryan, appeal to this Court from the motion justice's [1] entry of judgment, pursuant

1. The justice of the Superior Court to whom the clerical sex abuse cases discussed herein was initially assigned retired in 2001, and on November 27, 2001 the cases were reassigned

to Rule 54(b) of the Superior Court Rules of Civil Procedure, in favor of the following defendants: Most Reverend Louis E. Gelineau, Most Reverend Daniel P. Reilly, Most Reverend Kenneth A. Angell, the Roman Catholic Bishop of Providence (a corporation sole), and Saint Thomas Church of Manton.[2]

On appeal, the plaintiffs contend: (1) that the motion justice erred in granting summary judgment in favor of the instant defendants; (2) that the motion justice erred in denying plaintiffs' motion to recuse; (3) that the motion justice erred in denying plaintiffs' motion to vacate the judgment; and (4) that the motion justice erred in not holding a hearing with respect to the instant defendants' motion for summary judgment, plaintiffs' motion to recuse, and plaintiffs' motion to vacate.

For the reasons set forth in this opinion, we affirm the Superior Court's grant of summary judgment in favor of the instant defendants.

### Facts and Travel

Beginning in October of 1978, when she was seventeen years old, Mary Ryan became involved in a sexual relationship with a Roman Catholic priest, Monsignor Louis W. Dunn.[3]

During their four-year relationship, Ms. Ryan engaged in consensual sexual activities with Dunn that involved digital penetration and oral sex "on an average of five times a week." *See State v. Dunn*, 726 A.2d 1142, 1143 (R.I.1999). There is testimony by Ms. Ryan to the effect that she was induced into performing those sexual acts in part because of her love for Dunn and in part because of her belief that "each and every act was an act of God"; she also testified as to her conviction that, as a priest, Dunn possessed the power of God and thus was to be feared and obeyed.[4]

The sexual relationship continued for four years, until Ms. Ryan was twenty-one years old; the relationship abruptly ended on June 7, 1982, when Dunn forcibly had intercourse with Ms. Ryan against her will. *See Dunn*, 726 A.2d at 1144.

Ms. Ryan did not reveal to anyone the June 1982 sexual assault or any other aspect of her sexual relationship with Dunn until 1986. In 1986, Ms. Ryan, speaking only in general terms, informed a friend of hers, Gene Pistacchio,[5] that she had had a sexual relationship with Dunn. That was Ms. Ryan's only disclosure about the subject until December of 1993 (more than ten years after the relationship with Dunn had ended and at a point in time when she was thirty-two years old); at that time she provided Gene Pistacchio with some specific details concerning the sexual incidents that had occurred between herself and

to another justice of the Superior Court. Subsequently, on February 11, 2002, the cases were reassigned to a third justice. For the sake of clarity, we shall refer to this third justice (who eventually ruled on the subject motion for summary judgment) as "the motion justice."

2. The motion justice referred to the above-listed defendants as "the Hierarchical defendants." In this opinion, we shall refer to them as "the instant defendants."

3. Dunn died in April of 2001.

4. As a result of an incident that occurred on June 7, 1982, in which Dunn forcibly had intercourse with Ms. Ryan against her will, he was indicted and ultimately convicted of first-degree sexual assault in a jury-waived trial in 1997. That conviction was thereafter affirmed by this Court. *See State v. Dunn*, 726 A.2d 1142 (R.I.1999).

5. The record suggests that Gene Pistacchio was at one time a cleric, but the record is silent as to whether he is still a cleric. Accordingly, we shall use no title in referring to him; we certainly imply no disrespect.

Dunn. During this same period, Ms. Ryan became convinced that Dunn was a "fraud" when she learned that he had been sexually involved with other women, and she informed her husband that she "had realized that [Dunn] had abused" her. Ms. Ryan testified that she had remained silent for so long a time about her relationship with Dunn because she feared what Dunn could do to her in view of her belief that he possessed the power of God.

It was not until 1994 that Ms. Ryan began telling a number of other people, including her husband and several of the nonperpetrator defendants,[6] about the sexual assault that had occurred on June 7, 1982.[7]

Regrettably, Dunn was one of several Rhode Island priests who engaged in inappropriate and lamentable sexual abuse of certain individuals. As a result of those several occurrences, thirty-eight civil actions, including the instant case,[8] were filed by or on behalf of persons who alleg-

edly were victims of that sexual abuse; named as defendants were twelve clerics alleged to be perpetrators and also various nonperpetrator defendants, such as those named in this action. Eventually, all thirty-eight cases were assigned to a single justice of the Superior Court to facilitate their management.

In the course of his initial review of the case records, the third Superior Court justice assigned to said cases (whom we refer to as "the motion justice"; see footnote 1, *supra* ) became aware of the fact that with respect to many of the cases, including this one, the pertinent statute of limitations, absent applicability of a viable tolling theory, posed a significant impediment for plaintiffs.

At that point in time, the motion justice urged all parties involved to engage in settlement and/or mediation proceedings under the aegis of Commonwealth Mediation, a Massachusetts-based firm that specializes in the process of mediation. In the

---

**6.** Adopting the terminology employed by this Court in *Kelly v. Marcantonio,* 678 A.2d 873, 875 n. 2 (R.I.1996), the motion justice in the instant case distinguished between perpetrator defendants (*i.e.,* those who actually engaged in the sexual activity at issue) and nonperpetrator defendants (*i.e.,* those whom plaintiffs sought to hold liable under some theory other than actual wrongful engagement in sexual activity). We shall employ the same terminology in this opinion.

**7.** Additional facts concerning the sexual assault are set forth in this Court's opinion affirming the conviction of Dunn. *See State v. Dunn,* 726 A.2d 1142 (R.I.1999).

**8.** The Ryans commenced the instant civil action on December 6, 1995. Thereafter, they filed an amended complaint which contained numerous counts against various defendants (including the instant defendants). Those counts contained allegations of, *inter alia:* (1) racketeering and corruption; (2) first-degree sexual assault; (3) second-degree sexual assault; (4) harboring criminals; (5) com-

pounding and concealing a felony; (6) conspiracy; (7) intimidation of witnesses; (8) assault with intent to commit a felony; (9) aiding and abetting; (10) assault and battery; (11) obstruction of justice and of the judicial system; (12) exploitation for immoral purposes; (13) employment of children for unlawful purposes; (14) money laundering; (15) contributing to the delinquency of a minor; (16) cruelty to or neglect of a child; (17) impersonation of a public officer; (18) concealment or transfer of property with intent to defraud creditors; (19) obstruction of officers in execution of duty; (20) perjury and attempts to procure perjury; (21) transportation for indecent purposes; (22) stalking; (23) intentional harm and misconduct; (24) unfair and deceptive trading practices; (25) undue influence and religious duress; (26) false imprisonment; (27) breach of statutory duty; (28) breach of *in loco parentis;* (29) *respondeat superior;* (30) negligence for premises liability; (31) fraudulent concealment; (32) misrepresentation; (33) loss of consortium; (34) invasion of privacy; and (35) intentional infliction of emotion distress.

Summer of 2002, after three months of mediation, all of the then-pending sexual abuse cases, except the instant case, were settled for a total amount of $13.5 million. The Ryans chose not to participate in the settlement process; rather, they chose to pursue their civil action against the instant defendants. Subsequently, their counsel moved to withdraw, and on October 8, 2002 that motion was granted.

The motion justice urged the Ryans to find another attorney, and he granted them five continuances, spanning from October 8, 2002 to March 20, 2003, in which to do so. He also instructed them to advise the court of their progress with respect to engaging new counsel. In addition, the motion justice insisted that the mediators who had been instrumental in assisting the successful resolution of the other cases (*viz.*, representatives of Commonwealth Mediation) be present in court on October 8, 2002, so that the Ryans might have the opportunity to (1) consult with them outside of the presence of defense counsel, and (2) be apprised of their options. The discussions between the Ryans and the mediators were not successful. The Ryans were also not successful in their attempts to secure new counsel, and they elected to proceed on a *pro se* basis.

At about the same time, on November 19, 2002, the instant defendants moved for summary judgment, contending that the Ryans' claims were barred by the statute of limitations.[9] In response, the Ryans filed a document entitled "Motion to Re-new Motion to Compel Discovery and to Strike or Defer Hierarchical Defendants' Motion for Summary Judgment on the Statute of Limitations." In that motion, they asserted: (1) that certain "management orders" previously issued by the Superior Court precluded the instant defendants from moving for summary judgment on statute of limitations grounds; and (2) that they needed to conduct further discovery in order to buttress their theory that the statute of limitations should be tolled due to what they referred to as "conspiracy" and "fraudulent concealment" on the part of the instant defendants. On April 3, 2003, the motion justice denied plaintiffs' motion, and he also ordered plaintiffs to "file appropriate pleadings in response to [the] summary judgment motion on or before May 16, 2003."

On August 26, 2003, the motion justice issued a comprehensive and scholarly rescript decision,[10] in which he first ruled that the applicable statute of limitations for a civil action filed against nonperpetrators in the sexual abuse context is three years. He then went on to conclude that, because the sexual assault that was the basis for the instant civil action occurred on June 7, 1982, the last date upon which the plaintiffs could properly have commenced suit was June 7, 1985. Accordingly, the motion justice ruled that, since the plaintiffs complaint was not filed within the applicable three-year period,[11] it was time-barred absent a valid tolling theory.[12] Af-

---

9. The applicable statute, G.L.1956 § 9–1–14(b), provides: "Actions for injuries to the person shall be commenced and sued within three (3) years next after the cause of action shall accrue, and not after."

10. *Ryan v. Roman Catholic Bishop of Providence*, No. Civ.A. PC95–6524, 2003 WL 22048785 (R.I.Super. Aug. 26, 2003).

11. It will be recalled that the complaint was not filed until December 6, 1995.

12. Depending on the context, the word "tolling" can have various meanings in legal writing. In this opinion, we use the word to refer to the suspension of a pertinent statute of limitations for a period of time. *See Developments in the Law—Statutes of Limitations*, 63 Harv. L.Rev. 1177, 1177 n. 1 (1950) (hereinafter *Developments in the Law* ).

ter addressing each of the plaintiffs' asserted tolling theories, the motion justice further ruled that no valid tolling theory applied. Accordingly, the motion justice granted the instant defendants' motion for summary judgment.

Subsequently, on September 3, 2003, the Superior Court entered final judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure. The final judgment document explicitly states that the court is "dismissing all of the plaintiffs' claims against [the instant defendants]." On September 9, 2003, plaintiffs filed a motion to reconsider the summary judgment; that motion was denied in an order issued on September 16. On September 19, 2003, the Ryans appealed to this Court.

On January 20, 2004, plaintiffs filed a motion to vacate judgment pursuant to Rule 60(b) of the Superior Court rules of Civil Procedure contending, *inter alia*, that the court's decision was arbitrary and capricious, that the court lacked jurisdiction, and that plaintiffs were wrongly precluded from addressing their tolling theories or conducting discovery with regard to same.

In addition, on January 26, 2004, the Ryans filed a motion to recuse the motion justice, asserting that the trial court had demonstrated: (1) "that it is prejudicial and biased toward plaintiffs because they did not enter a mediation/binding arbitration process * * * promoted by" the court; and (2) "that it [is] incapable of rendering a fair and impartial decision." On February 19, 2004, the motion justice denied the motion to vacate and the motion to recuse.

In their appeal, plaintiffs contend: (1) that the motion justice erred in granting summary judgment in favor of the instant defendants; (2) that the motion justice erred in denying plaintiffs' motion to recuse; (3) that the motion justice erred in denying plaintiffs' motion to vacate judgment; and (4) that the motion justice erred in not holding a hearing with respect to the instant defendants' motion for summary judgment, plaintiffs' motion to recuse, and plaintiffs' motion to vacate.

## Standard of Review

This Court reviews a Superior Court justice's decision to grant summary judgment on a *de novo* basis. *Lacey v. Reitsma*, 899 A.2d 455, 457 (R.I.2006); *DelSanto v. Hyundai Motor Finance Co.*, 882 A.2d 561, 564 (R.I.2005). In conducting that review, we employ the same standards that the motion justice employed. *Lacey*, 899 A.2d at 457. As such, we will affirm the grant of summary judgment if, after viewing the evidence in the light most favorable to the nonmoving party, we conclude that there are no genuine issues of material fact to be decided and that the moving party is entitled to judgment as a matter of law. *Id.; see also Ruggiero v. City of Providence*, 893 A.2d 235, 237 (R.I. 2006).

## Analysis

### I

### Statute of Limitations

### A

### The Underlying Public Policy

Statutes of limitation serve important societal purposes. Well over a hundred years ago, in the case of *Wood v. Carpenter*, 101 U.S. 135, 25 L.Ed. 807 (1879), the United States Supreme Court cogently summarized several of those purposes:

"Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their founda-

tion. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar." *Id.* at 139.

Statutes of limitation "are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Order of Railroad Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342, 348–49, 64 S.Ct. 582, 88 L.Ed. 788 (1944) (Jackson, J.); *see also Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945); *see generally* Charles C. Callahan, *Statutes of Limitation—Background,* 16 Ohio St. L.J. 130 (1955). They are the product of a balancing of the individual person's right to seek redress for past grievances against the need of society and the judicial system for finality—for a closing of the books.[13]

### B

### The Applicable Statute of Limitations

 It is well settled in this jurisdiction that a civil action seeking damages for injuries resulting from sexual abuse of a minor asserted against nonperpetrator defendants must be filed within three years pursuant to G.L.1956 § 9–1–14(b). *Kelly v. Marcantonio,* 678 A.2d 873, 877 (R.I. 1996); *see also Kelly v. Marcantonio,* 187 F.3d 192, 195–96 (1st Cir.1999). Section 9–1–14(b) provides that "[a]ctions for inju-

ries to the person shall be commenced and sued within three (3) years next after the cause of action shall accrue, and not after." This Court has previously concluded that, absent an applicable tolling theory, "as far as nonperpetrators are concerned, the statute of limitations for such actions begins to run at the time the injury occurs * * *." *Kelly,* 678 A.2d at 877.

The date of the sexual assault on Ms. Ryan was June 7, 1982, at which time Ms. Ryan was twenty-one years old. Thus, the three-year statute of limitations began to run on June 8, 1982,[14] and June 7, 1985 was the last date on which plaintiffs could have filed their civil action within the statutory period. However, plaintiffs did not file their suit until December 6, 1995— *more than ten years after the statutory period had run.* Accordingly, plaintiffs' complaint was facially time-barred.

In opposing the motion for summary judgment, the Ryans bore the burden of establishing a valid theory that would toll the running of the three-year statutory period. *See Olshansky v. Rehrig International,* 872 A.2d 282, 286 (R.I.2005); *Casco Indemnity Co. v. Gonsalves,* 839 A.2d 546, 548 (R.I.2004).

### II

### Tolling Theories

The plaintiffs advance three theories in support of their contention that the applicable statute of limitations should be tolled, namely that: (1) the instant defendants fraudulently concealed from plaintiffs the existence of their criminal con-

---

**13.** *See Developments in the Law,* 63 Harv. L.Rev. at 1185 ("There comes a time when [a defendant] ought to be secure in [the] reasonable expectation that the slate has been wiped clean of ancient obligations * * *.").

**14.** *See* Rule 6(a) of the Superior Court Rules of Civil Procedure (providing that "the day of the act, event, or default after which the designated period of time begins to run is not to be included"); *see also Burke v. Rhode Island College,* 671 A.2d 803, 804 (R.I.1996) (construing Rule 6(a)).

duct; (2) a statutory tolling provision is applicable; and (3) the instant defendants waived the statute of limitations defense. We have considered each of these theories in turn, and we have concluded that none of the cited tolling theories may properly be invoked in the present case.[15]

## A

### Fraudulent Concealment

■ The Ryans assert that the statute of limitations is tolled by what they call the instant "defendants' alleged intentional misconduct toward [the Ryans] in fraudulently concealing the existence of the criminal and tortious conduct." We reject this argument.

■ Pursuant to the provisions of § 9–1–20, if a potential defendant fraudulently conceals a cause of action from a potential plaintiff, the statute of limitations is tolled until such time as the plaintiff discovers the existence of a cause of action.[16] In order to demonstrate that there has been fraudulent concealment on the part of a defendant, a plaintiff must show: (1) that

the defendant made an actual misrepresentation of fact; and (2) that, in making such misrepresentation, the defendant fraudulently concealed the existence of plaintiff's causes of action. *Kelly*, 187 F.3d at 200 (applying Rhode Island law); *see also Renaud v. Sigma–Aldrich Corp.*, 662 A.2d 711, 714 (R.I.1995) (holding that fraudulent concealment tolls the statute of limitations only as to those defendants who made the misrepresentations).

■ Mere silence or inaction on the part of the defendant does not constitute actual misrepresentation in this context. *See Caianiello v. Shatkin*, 78 R.I. 471, 476–77, 82 A.2d 826, 829 (1951); *Kenyon v. United Electric Railways Co.*, 51 R.I. 90, 94, 151 A. 5, 8 (1930); *see also Smith v. O'Connell*, 997 F.Supp. 226, 238 (D.R.I.1998), *aff'd sub nom Kelly v. Marcantonio*, 187 F.3d 192, 200 (1st Cir.1999). Rather, the plaintiff must demonstrate that the defendant made an "express representation or [engaged in] other affirmative conduct amounting in fact to such a representation which could reasonably deceive another and induce him [or her] to rely thereon to

---

15. The plaintiffs emphasize that there is no statute of limitations for first-degree sexual assault, but this assertion has absolutely no applicability in this civil case. While it is true that in the criminal context there is no statute of limitations for first-degree sexual assault, the applicable statute of limitations for a civil action stemming from sexual assault is three years.

The plaintiffs further contend that, pursuant to the provisions of G.L.1956 § 12–28–5, automatic judgment of liability should be entered against defendants in this case due to the fact that Dunn was convicted of first-degree sexual assault. Section 12–28–5 provides that upon an individual's "conviction of a felony after a trial by jury, a civil judgment shall automatically be entered by the trial court against the defendant." This argument is unavailing, however, since the nonperpetrator defendants were not convicted of first-degree sexual assault. Moreover, not even Dunn was convicted after a trial *by jury*. *See*

*State v. Dunn*, 726 A.2d 1142, 1142 (R.I. 1999).

In addition, the plaintiffs argue that the statute of limitations should have been tolled because the defendants were involved in a conspiracy that "has not ended to date." This Court has previously declined to add conspiracy as a disability that would toll the statute of limitations. *See Young v. Park*, 116 R.I. 568, 572–73, 359 A.2d 697, 699–700 (1976). We have considered the matter afresh, but we are not persuaded that we should change our position in that regard.

16. Section 9–1–20 provides:

"If any person, liable to an action by another, shall fraudulently, by actual misrepresentation, conceal from him or her the existence of the cause of action, the cause of action shall be deemed to accrue against the person so liable at the time when the person entitled to sue thereon shall first discover its existence."

his [or her] disadvantage." *Caianiello,* 78 R.I. at 476–77, 82 A.2d at 829; *see also State v. Wilkins,* 267 Kan. 355, 985 P.2d 690, 696 (1999) ("In order to constitute concealment of the fact of a crime, there must be a positive act done by the accused calculated to prevent the discovery that the offense has been committed. Mere silence, inaction, or nondisclosure does not constitute concealment."). The key consideration is whether or not the defendant fraudulently misrepresented material facts, thereby misleading the plaintiff into believing that no cause of action existed. *See Kelly,* 187 F.3d at 200.

The Ryans have not pointed to any evidence which would show that any of the instant defendants misled them into believing that the sexual assault did not occur, that Dunn did not in fact commit that assault, or that plaintiffs had suffered no injuries as a result of the assault. In sum, there is no evidence in the record that actual misrepresentations were made by the instant defendants with regard to the Ryans' potential civil claims; therefore, the applicable statute of limitations is not tolled by virtue of this theory.

**B**

**Discovery of Harm Done**

▄▄ The plaintiffs also assert that § 9–1–51, another statutory tolling provision, is applicable to the case at hand.[17] We disagree.

They assert that the statute of limitations should be tolled from the June 7, 1982 assault until December 1993, when she learned that Dunn had been involved in other relationships and thus was a fraud who did not possess the power of God. We have previously held, however, that "§ 9–1–51 has no application to claims made against nonperpetrator-defendants." *Kelly,* 678 A.2d at 877. Indeed, as this Court explicitly stated in that case:

"We perceive no persuasive policy considerations that the General Assembly failed to consider when enacting § 9–1–51 that would support judicial application of a discovery rule to claims made against nonperpetrator-defendants. If a plaintiff seeks to toll the running of § 9–1–14(b) in a sexual molestation action asserted against a non-perpetrator, he or she must do so pursuant to § 9–1–19 * * *."[18] *Kelly,* 678 A.2d at 878.

Moreover, the discovery rule that is set forth in § 9–1–51 does not retroactively apply to revive claims previously barred under the three-year statute of limitations as of July 25, 1993, the effective date of the

**17.** The relevant portion of § 9–1–51 provides: "(a) All claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within seven (7) years of the act alleged to have caused the injury or condition, or seven (7) years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by the act, whichever period expires later.
"* * *.
"(d) For purposes of this section, child means a person under the age of eighteen (18) years."

**18.** We note that plaintiffs have not contended that the applicable statute of limitations should be tolled by virtue of the "unsound mind" disability provision found in § 9–1–19. Section 9–1–19 provides:

"If any person at the time any such cause of action shall accrue to him or her shall be under the age of eighteen (18) years, or of unsound mind, or beyond the limits of the United States, the person may bring the cause of action, within the time limited under this chapter, after the impediment is removed."

legislation. *See Kelly,* 678 A.2d at 882–83; *see also Kelly,* 187 F.3d at 196. As stated above, the Ryans' claims were already time-barred as of June 7, 1985; thus, even if § 9–1–51 were applicable to their claims against the nonperpetrators, that statutory provision cannot act to revive their otherwise barred civil claims. Accordingly, we conclude that § 9–1–51 provides no relief for the instant plaintiffs.

 Even if § 9–1–51 were somehow applicable to the Ryans' case, their claim would still be barred by the statute of limitations because we conclude that their stated reason for the delay in filing suit was not objectively reasonable. Generally, a statute of limitations begins to run at the time the injury occurs. *See Kelly,* 678 A.2d at 877. Pursuant to the statutory discovery rule, however, the applicable statute of limitations does not begin to run until the plaintiff, in the exercise of reasonable diligence, discovers the injury or the injury-causing wrongful conduct. *See Mills v. Toselli,* 819 A.2d 202, 205 (R.I. 2003). "The reasonable diligence standard is based upon the perception of a reasonable person placed in circumstances similar to the plaintiff's, and also upon an objective assessment of whether such a person should have discovered that the defendant's wrongful conduct had caused him or her to be injured." *Martin v. Howard,* 784 A.2d 291, 300 (R.I.2001); *see also Kelly,* 187 F.3d at 201.

We are in full accord with the assessment of the motion justice in the instant case when he stated: "[F]rom any objective vantage point, a reasonable person of twenty-one years of age would surely have known that Dunn's forced sexual actions constituted actionable, wrongful conduct." At the time of the June 7, 1982 assault Ms. Ryan was twenty-one years old. She testified that at the time of the assault she was afraid and that Dunn was hurting her.

She further testified that she tried to prevent Dunn's actions by closing her legs and pushing against his chest. We conclude that the evidence establishes overwhelmingly that Ms. Ryan should have known prior to June 7, 1985 that she was sexually assaulted by Dunn. *See, e.g., Doe v. Creighton,* 439 Mass. 281, 786 N.E.2d 1211, 1214 (2003) (stating that the plaintiff's "failure to grasp the connection between her symptoms and the defendant's conduct" was not objectively reasonable); *K.B. v. Evangelical Lutheran Church in America,* 538 N.W.2d 152, 157 (Minn.Ct. App.1995) (affirming summary judgment where the plaintiff knew or reasonably should have known of her status as the victim of sexual abuse or of the causal connection between abuse and injury); *ABC v. Archdiocese of St. Paul and Minneapolis,* 513 N.W.2d 482, 487 (Minn.Ct. App.1994) (rejecting the contention that the plaintiff's subjective inability to comprehend the abusive situation tolled the statute of limitations); *see also Roe v. Archdiocese of St. Paul and Minneapolis,* 518 N.W.2d 629, 631–32 (Minn.Ct.App. 1994); *E.J.M. v. Archdiocese of Philadelphia,* 424 Pa.Super. 449, 622 A.2d 1388, 1394 (1993).

## C

### Waiver

 Finally, making the argument for the first time on appeal, plaintiffs contend that the instant defendants waived whatever statute of limitations defense might otherwise have been available to them due to the fact that the statute of limitations was not raised as an affirmative defense. It is, however, "an established rule in Rhode Island that this Court will not review issues that are raised for the first time on appeal." *Union Station Associates v. Rossi,* 862 A.2d 185, 192 (R.I. 2004); *see also Pollard v. Acer Group,* 870 A.2d 429, 432 (R.I.2005). Pursuant to our

well-established raise-or-waive rule,[19] this Court will not address arguments raised on appeal that were not presented to the trial justice for review. *State v. Briggs*, 934 A.2d 811, 815 (R.I.2007); *DeAngelis v. DeAngelis*, 923 A.2d 1274, 1280 (R.I.2007). After reviewing the voluminous record in its entirety, it is clear that plaintiffs never argued in the Superior Court that the instant defendants had waived any statute of limitations defense.

In sum, plaintiffs have presented no valid reason that would justify the thirteen-year delay in filing the instant case, and thus we affirm the grant of summary judgment in favor of the instant defendants. While "no one in good conscience could condone" the actions of Dunn, this civil suit is barred by the passage of time. *See ABC*, 513 N.W.2d at 488.

## III

### The Motion to Recuse

 As to plaintiffs' argument that the motion justice erred when he denied their motion to recuse because he had "an agenda to settle the cases * * * and he took whatever measures necessary to force the Ryans into conformity with that agenda," we conclude that said argument is completely meritless.[20]

 It is a well-recognized principle that judicial officers are duty-bound to recuse themselves if they are "unable to render a fair or an impartial decision in a particular case." *Kelly v. Rhode Island Public Transit Authority*, 740 A.2d 1243, 1246 (R.I.1999); *In re Antonio*, 612 A.2d 650, 653 (R.I.1992). At the same time, however, justices have an equally great obligation **not** to disqualify themselves when there is no sound reason to do so. *Kelly*, 740 A.2d at 1246; *State v. Clark*, 423 A.2d 1151, 1158 (R.I.1980). A party seeking recusal must establish that the justice has a "personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his [or her] impartiality seriously and to sway his [or her] judgment." *Kelly*, 740 A.2d at 1246 (quoting *Cavanagh v. Cavanagh*, 118 R.I. 608, 621, 375 A.2d 911, 917 (1977)).[21]

In the instant case, plaintiffs have utterly failed to convince us of the presence of

19. There are some narrow exceptions to the raise-or-waive rule, but none has any bearing in the context of this case. *See Pollard v. Acer Group*, 870 A.2d 429, 432 n. 10 (R.I.2005).

20. While we realize that plaintiffs are before us in a *pro se* status, we feel obliged to observe that the stated basis for their recusal motion reflects a profound misunderstanding of a crucially important aspect of the American judicial system—*viz.*, the settlement process and, more particularly, the mediation process. It goes without saying that not all cases settle, but the process whereby parties are earnestly encouraged by the court to engage in meaningful settlement discussions or mediation efforts is now and long has been a vital and integral part of what should transpire during the litigation process.

21. In their brief, defendants assert that "the moving party must prove that [the] alleged bias and prejudice stemmed from an extrajudicial source and that the judge based his decision on facts and events not pertinent before the court." This assertion, however, is not entirely accurate. *See, e.g., State v. Nordstrom*, 122 R.I. 412, 413–14, 408 A.2d 601, 602 (1979) (granting a new trial when the trial justice's disparaging statements concerning the defendants uttered outside of the courtroom were inconsistent with the impartiality required of judicial officers). As the United States Supreme Court stated in *Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994):

"It is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that 'extrajudicial source' is the *only* basis for establishing disqualifying bias or prejudice. It is the only *common* basis, but not the exclusive one, since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because,

any personal bias or prejudice on the part of the motion justice. The plaintiffs contend that the motion justice "exhibited his animosity toward the Ryans for not complying with his settlement agenda" and that he "should have recused himself when he took on the role of the defense counsel to force that agenda."

It is completely clear to us that, far from being prejudicial or biased, the actions that the motion justice took in an attempt to help the parties avoid yet further protracted litigation in an already long-drawn-out and complex case were commendable; his actions and statements relative to the settlement process were entirely appropriate.[22] Indeed, this Court has frequently encouraged parties to engage in meaningful settlement negotiations. *See, e.g., Greensleeves, Inc. v. Smiley*, 942 A.2d 284, 294 n. 19, 2007 WL 4335539 (R.I.2007) (describing the long pendency of that case as regrettable and expressly encouraging "the parties and their attorneys to make every effort to dispose of the remaining bone of contention at this time by engaging in meaningful settlement negotiations"); *Northern Trust Co. v. Zoning Board of Review of Westerly*, 899 A.2d 517, 520 (R.I.2006) (mem.) ( "[W]e are keenly aware of the judiciary's obligation to see to it that litigation be not unduly or improperly prolonged."). No less renowned a figure than Abraham Lincoln recognized the desirability of settlement when possible. He wrote:

"Discourage litigation. Persuade your neighbors to compromise whenever you can. Point out to them how the nominal winner is often a real loser—in fees, expenses, and waste of time." Abraham Lincoln, Notes for Law Lecture (July 1, 1850), *as reprinted in* 2 *Complete Works of Abraham Lincoln* 142 (John G. Nicolay & John Hay eds. 1894).

It is very much an important part of the policy of the courts of Rhode Island (and courts in general) to encourage the amicable settlement of disputes, whether by mediation or otherwise. *See, e.g., Zarrella v. Minnesota Mutual Life Insurance Co.*, 824 A.2d 1249, 1253 n. 2 (R.I.2003) (observing that "the parties would have been better served by mediation"); *Skaling v. Aetna Insurance Co.*, 799 A.2d 997, 1012 (R.I. 2002) ("It is the policy of this state to encourage the settlement of controversies in lieu of litigation."); *see also United States v. Davis*, 261 F.3d 1, 27 (1st Cir. 2001) (noting that there is a "strong public policy in favor of settlements") (internal citations omitted); *Arruda v. Sears, Roebuck & Co.*, 273 B.R. 332, 345 (D.R.I.2002) ("[I]n Rhode Island, courts favor the settlement of litigation disputes."). As we have previously stated:

"Our policy is always to encourage settlement. Voluntary settlement of disputes has long been favored by the courts." *Homar, Inc. v. North Farm Associates*, 445 A.2d 288, 290 (R.I. 1982).[23]

Our judicial system encourages settlement because it serves several laudable purposes, among them lessening the strain on scarce judicial resources and preventing litigants from sustaining significant costs. *See, e.g., LaFleur v. Shoney's, Inc.*, 83

even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Id.* at 551, 114 S.Ct. 1147.

**22.** The travel of this case has been long and arduous, and the patience and attentiveness

of the justices of the Superior Court who have presided over it at various points in time are to be commended.

**23.** *See also Calise v. Hidden Valley Condominium Association, Inc.*, 773 A.2d 834, 839 (R.I. 2001).

S.W.3d 474, 478 (Ky.2002) ("[T]he settlement of cases serves the dual and valuable purposes of reducing the strain on scarce judicial resources and preventing the parties from incurring significant litigation costs."); *see also D.H. Overmyer Co. v. Loflin,* 440 F.2d 1213, 1215 (5th Cir.1971); *see generally* 15A C.J.S. *Compromise and Settlement* § 1 (2002).

In view of the venerable judicial policy of encouraging settlement and endorsing the mediation alternative, it borders on the offensive for a party to claim that a justice should be recused for adhering to this policy. We see no reason why the efforts of a trial justice to encourage settlement is in any way indicative of personal bias or prejudice; by encouraging settlement, a trial justice is not expressing a preconceived view of the case before him or her, but rather is simply promoting this state's sound policy of favoring settlement and/or mediation of disputes. Moreover, by encouraging settlement a trial justice is not attempting to deny litigants their day in court, but is merely presenting them with one of the options available to them. It is clear from the record in this case that plaintiffs consciously opted not to participate in the mediation process.

For the aforementioned reasons, we conclude that the appeal from the denial of the motion to recuse is without merit, and we affirm the ruling of the Superior Court.

### III

### The Motion to Vacate Judgment

■ The plaintiffs also appeal from the motion justice's order denying their motion to vacate the judgment pursuant to Rule

60(b) of the Superior Court Rules of Civil Procedure that was rendered in favor of the instant defendants.

■ Our review of a decision denying a motion to vacate a judgment is limited to examining "the correctness of the order granting or denying the motion, not the correctness of the original judgment." *Greenfield Hill Investments, LLC v. Miller,* 934 A.2d 223, 224 (R.I.2007) (mem.); *McBurney v. Roszkowski,* 875 A.2d 428, 435 (R.I.2005). Accordingly, a motion to vacate a judgment is left to the sound discretion of the Superior Court justice, and his or her ruling will not be disturbed on appeal absent an abuse of discretion. *Greenfield,* 934 A.2d at 224; *McBurney,* 875 A.2d at 435; *Labossiere v. Berstein,* 810 A.2d 210, 213 (R.I.2002).

The plaintiffs contend that the motion justice ignored evidence that other plaintiffs had entered into what the Ryans refer to as "binding arbitration" with various defendants and that evidence of such had not been placed in the record.[24] We see no reason why the fact that other plaintiffs involved in clerical sex abuse litigation had entered into "binding arbitration" would have any bearing on a justice's determination of whether or not to grant a motion to vacate summary judgment. Therefore, we conclude that the motion justice did not abuse his discretion when he denied plaintiffs' motion to vacate judgment.

### IV

### Absence of Oral Argument

■ With respect to the instant defendants' motion for summary judgment and plaintiffs' motion to vacate judgment

---

**24.** In their motions for reconsideration and to vacate judgment, plaintiffs raised several additional arguments. However, those arguments were not briefed properly for review by this Court. "Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues,

does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." *Wilkinson v. State Crime Laboratory Commission,* 788 A.2d 1129, 1131 n. 1 (R.I.2002); *see also O'Rourke v. Industrial National Bank of R.I.,* 478 A.2d 195, 198 n. 4 (R.I.1984).

and motion to recuse, plaintiffs argue on appeal that they were denied due process because the motion justice decided those motions without there having been a hearing and oral argument. It is significant, however, that the Ryans were permitted to submit multiple memoranda and other written submissions to the court, and "the absence of an opportunity to supplement written submissions with oral advocacy [does not] constitute a denial of due process." *Cruz v. Melecio*, 204 F.3d 14, 19 (1st Cir.2000); *see also Federal Communications Commission v. WJR, The Goodwill Station, Inc.*, 337 U.S. 265, 276, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949); *United States v. One 1974 Porsche 911–S*, 682 F.2d 283, 286 (1st Cir.1982) ("There is no constitutional right to oral argument on a summary judgment motion."); *Dredge Corp. v. Penny*, 338 F.2d 456, 462 n. 14 (9th Cir.1964) ("The opportunity to be heard orally on questions of law is not an inherent element of procedural due process, even where substantial questions of law are involved."). The decision as to whether or not to hold a hearing and allow oral argument is within the discretion of the court, and there is no abuse of discretion when the complaining party can "point to no single, definable aspect of its position which could not have been adequately presented by a written submission," as is true in the instant case. *Domegan v. Fair*, 859 F.2d 1059, 1065 (1st Cir.1988) (internal quotation marks omitted); *see also United States v. DeCologero*, 821 F.2d 39, 44 (1st Cir.1987); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 411 (1st Cir.1985). We are convinced that the motion justice did not abuse his discretion when he elected not to hold a hearing with regard to plaintiffs' motions.

## Conclusion

We have genuine empathy for Ms. Ryan. She was the victim of heinous criminal conduct committed by one who showed himself to be unworthy of the honorific title that he once bore. As was certainly her right, Ms. Ryan (along with her husband) thereafter sought some degree of relief by availing herself of the judicial system and commencing a civil action. At various points in that process, Ms. Ryan was called upon to make decisions. In accordance with his responsibility, the motion justice was also required to make a decision, and he did so. We affirm that decision in all respects. The American judicial system as it exists today is admirable: it is the product of many decades of fine-tuning of an already excellent substantive and procedural construct which this country took with it when it parted ways with England. Nevertheless, our judicial system is not a panacea that can satisfy everyone who has recourse to it. Some wrongs and injuries do not lend themselves to *full* redressment by the judicial system.

It is now time for the litigation with respect to the instant defendants to come to an end. The plaintiffs have had their day in court, and there is nothing left for them to litigate with respect to the several parties involved in this appeal. *See Northern Trust Co.*, 899 A.2d at 520 ("We are more than persuaded that the instant plaintiffs have had their day in court—and then some. The time has come for this litigation to end."); *see also Arena v. City of Providence*, 919 A.2d 379, 396 (R.I.2007) ("It is time for this litigation to end."); *Gunn v. Union Railway Co.*, 27 R.I. 320, 337, 62 A. 118, 125 (1905).

For the reasons stated herein, we deny the appeal, and we affirm the judgment of the Superior Court. The papers in the case may be remanded to the Superior Court.