**Supreme Court**

No. 2014-97-Appeal.
(PC 10-3678)

Joseph McNulty et al.        :

v.        :

Kristen Chip et al.        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Joseph McNulty et al.       :

v.         :

Kristen Chip et al.       :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.** Home is a shelter from storms—all sorts of storms.[1]
Unfortunately for the plaintiffs, Joseph and Elizabeth McNulty, that was not the case with the
dwelling they purchased from Kristen Chip at 5 Meadowbrook Road, Lincoln (the property).
Within weeks of purchasing their new home, the plaintiffs experienced significant flooding in the
driveway, garage, and basement. The flooding and water-penetration issues persisted over the
next several years, culminating in March 2010, when the plaintiffs experienced extensive
flooding of the property. As a result, the plaintiffs filed suit against the defendants, seeking to
recover under the theories of breach of contract, negligence, and fraud. Before this Court, the
plaintiffs appeal from a judgment of the Superior Court granting the defendants' motions for
summary judgment. After hearing the arguments of the parties and examining the memoranda
that they submitted, we are of the opinion that the merger and disclaimer clause contained in the
purchase and sales agreement was not drawn with sufficient specificity to bar the plaintiffs'
claim for fraud. As a result, and for the reasons set forth in this opinion, we affirm in part, and
vacate in part, the judgment of the Superior Court.

---

[1] William J. Bennett.

# I

## A. Facts

From 1972 until 2002, the parents of the defendant, Kristen Chip (Chip), owned and resided at the property. Chip herself lived there during her childhood and until she relocated for college in 1987. In 1998, more than ten years after Chip moved away, her parents experienced flooding that was significant enough to be the subject of a local newspaper article. The article included a picture during the 1998 flood that showed Chip's father walking through standing water that had pooled in front of the house. At their respective depositions, Chip and her father each testified that Chip was not living at the property at the time of the 1998 flood. Further, Chip testified that she had no knowledge of the 1998 flood until plaintiffs' counsel mailed a copy of the newspaper article to her after the commencement of this suit. When he was deposed, Chip's father was asked whether he had told his daughter about the flood. He testified as follows:

> "I don't recall. 1998, I don't even know where she was. She wasn't living at home. I'm sure she knew about it, but I didn't make a specific effort to tell her about the flood. It's just common sense that the discussion had to have taken place at some point."

Chip's father also explained that the 1998 flood did not cause significant damage to the property and that only about one or two inches of wallboard in the basement became wet.

In 2002 Chip purchased the property from her parents. At her deposition, Chip testified that, during the course of this transaction, she was not represented by a real estate agent, did not receive a real estate disclosure form from her parents, and did not inspect the property before she bought it. In addition, Chip testified that she had no knowledge of previous flooding at the property and asserted that she never spoke with her parents about any flooding issues. However,

Chip did indicate that she was aware that periodic flooding had occurred at the adjacent properties, 3 and 7 Meadowbrook Road.

In 2004 Chip became interested in selling the property and she retained Michael Pinelli (Pinelli) to serve as her real estate agent in that effort. With the assistance of Pinelli, Chip completed and executed a real estate disclosure form, in which she indicated that there had been no previous flooding or water penetration at the property. Pinelli testified at his deposition that Chip did not personally fill out the disclosure forms; rather, he read each question on the forms to Chip and she provided him with a response, which he marked on the forms himself.

The plaintiffs became interested in purchasing the property and eventually they entered into a dual-agency agreement with Pinelli that allowed him to act as an agent for both plaintiffs and Chip. The plaintiffs visited the property on several occasions, both with and without Pinelli. They also retained Answer Home Inspection to inspect the premises. On July 16, 2005, the inspection was conducted. Present during the inspection were the home inspector, Tom Lenahan; the plaintiffs; Elizabeth's parents; and Pinelli. Significantly, during the course of the inspection, Pinelli allegedly told Elizabeth's mother, in response to a specific inquiry about water incursion, that there previously had been "maybe an inch or so" of water in the basement.[2]

The inspection report that was generated by the home inspector was eventful; it noted that the "moisture level in the basement [is] very high, caution advised." The inspection report also indicated that there was evidence of water penetration, dampness, water stains, and

---

[2] At his deposition, Pinelli adamantly denied that he had discussed previous flooding or water penetration in the basement with any member of the McNulty family. However, in viewing the evidence in the light most favorable to plaintiffs, as required when reviewing a motion for summary judgment, we will assume that Pinelli did in fact make the "maybe an inch or so" of water comment during the home inspection. See Sola v. Leighton, 45 A.3d 502, 506 (R.I. 2012) (citing National Refrigeration, Inc. v. Standen Contracting Co., 942 A.2d 968, 971 (R.I. 2008)).

efflorescence[3] in the basement. Lastly, the report recommended that a new sump pump be installed and that plaintiffs consult with the owner of the property for a historical perspective on the issue of water penetration. It is undisputed that, despite the recommendations contained in the inspection report, plaintiffs took no corrective action, nor did they seek additional information from Chip concerning previous water damage.

On July 25, 2005, plaintiffs executed a purchase and sales agreement, under the terms of which they agreed to buy the property for $390,000. Section 15 of the purchase and sales agreement contained the following disclaimer: "The Property is being sold in 'AS IS' condition and Buyer represents that it has not relied on the oral representations of the Seller, or the Broker(s) or their agents as to the character or quality of the Property." Further, section 19 of the agreement, pertaining to inspections, stated that "Buyers have already completed thier [sic] inspection of the property and are buying it in as in [sic] condition all other conditions stated in this contract remain in force." Finally, plaintiffs initialed the following statement: "Having been informed of the right to test/inspect, the Buyer elects not to have any test(s)/inspection(s) performed. (Inspection performed 7/16/05.)"

On September 30, 2005, Chip conveyed the property to plaintiffs by deed. In October 2005, after the sale was finalized, but before plaintiffs were able to move into the property, a heavy rainstorm caused the driveway, garage, and basement to flood to a significant degree. At her deposition, Elizabeth estimated that between two or three feet of water accumulated in the basement during the flood. She further testified that when she looked into the basement, she saw that "the water was very high. I saw things floating by." As a result, plaintiffs called upon the

---

[3] The inspection report explained that efflorescence is a "white powdery substance often evident on concrete walls and floors" that is "usually an indication that dampness or water penetration has occurred at some time."

Albion Fire Department to pump the water out of the basement. In the aftermath of the October 2005 flood, plaintiffs received a letter from Greg Jergensen, the son of the developer of the neighborhood. The letter explained that, since 1968, the area had been susceptible to significant flooding.

Elizabeth also testified that, from 2006 to 2007, there were "situations where if it rained hard or if it rained, we would experience water coming in through some foundational cracks, and it wasn't just like seepage, it was shooting from the wall and, you know, landing between one and two feet away from the wall." As a result, plaintiffs retained Pioneer Basements to perform waterproofing services, including the installation of five sump pumps in the basement and a water drainage system around the perimeter of the property. Nonetheless, in March 2010, another heavy rainstorm, of an admittedly historic proportion, caused significant flooding of the property, with two feet of water accumulating in the basement.

**B. Travel**

The journey of this case has been somewhat circuitous as it has made its way to this Court. On June 24, 2010, plaintiffs filed suit in Providence County Superior Court naming Chip, Pinelli, RPZ Realty, Inc. (RPZ), RE/MAX, LLC, and RE/MAX of New England, Inc. (collectively RE/MAX), as defendants. On October 5, 2010, plaintiffs filed an amended complaint that contained seven causes of action: fraudulent misrepresentation against all defendants (count 1); negligent misrepresentation against all defendants (count 2); deceptive trade practices against Pinelli, RE/MAX, and RPZ (count 3); breach of the implied warranty of good faith and fair dealing against Pinelli and Chip (count 4); breach of contract against Chip (count 5); negligence against all defendants (count 6); and breach of fiduciary duty against Pinelli (count 7).

**Hearings of June 19 and 26, 2012**

On September 1, 2011, Pinelli and RPZ moved for summary judgment, arguing that plaintiffs' negligence claims were time-barred and that the claim of fraudulent misrepresentation was barred by the disclaimer, or, in the alternative, that plaintiffs could not satisfy the elements of that cause of action. On June 19, 2012, after approximately one year, and four continuances that had been requested by plaintiffs' counsel and consented to by defendants, the motion for summary judgment finally was heard by a justice of the Superior Court. At the hearing, plaintiffs conceded that summary judgment should enter on the contract claims, counts 4 and 5, as well as the deceptive trade practices claim, count 3. Further, the hearing justice determined that the negligence claims, counts 2, 6, and 7, were subject to a three-year statute of limitations and that "the discovery rule" should not toll the limitations period because plaintiffs knew, or should have known, of the water problems as early as 2005 or 2006.[4] Therefore, based on the statute of limitations, the hearing justice granted summary judgment on counts 2, 6, and 7. Lastly, the hearing justice took the claim for fraudulent misrepresentation under advisement. Later, on June 26, 2012, the justice granted summary judgment on that claim because of the merger and disclaimer clause contained in the purchase and sales agreement.[5] At this point, only Pinelli and RPZ had been dismissed from the case.

---

[4] The discovery rule provides that "the applicable statute of limitations will be tolled and will not begin to run until, in the exercise of reasonable diligence, the plaintiff should have discovered the injury or some injury-causing wrongful conduct." Martin v. Howard, 784 A.2d 291, 299 (R.I. 2001).

[5] Because the hearing justice granted Pinelli and RPZ's motion for summary judgment on all counts of plaintiffs' amended complaint, their pending motion to amend their answer to include the statute of limitations affirmative defense was passed.

**Hearings of December 4 and 7, 2012**

On July 20, 2012, RE/MAX filed a motion for summary judgment arguing that RE/MAX could not be held liable because the court had determined that there was no underlying liability for their franchisee, RPZ, and its alleged agent, Pinelli. On December 4, 2012, the RE/MAX motion for summary judgment was argued before a different hearing justice than had heard the earlier summary judgment motions. On December 7, 2012, the second hearing justice issued a bench decision, in which he found that all the claims against RE/MAX were derivative of the claims against RPZ and Pinelli. The second hearing justice determined that there could be no liability against RE/MAX as a matter of law because the first hearing justice had previously granted RPZ and Pinelli's motion for summary judgment; therefore, the second hearing justice expressed his opinion that RE/MAX's motion was rendered moot and he did not decide it on the merits. The second hearing justice did express concern that issues of fact existed with respect to the existence, or non-existence, of an agency relationship between Pinelli, RPZ, and RE/MAX. Nonetheless, the hearing justice did not specifically rule on RE/MAX's motion; instead, he instructed RE/MAX to file a subsequent motion asking the court to rule that it no longer faced liability in this case.

**Hearings of February 26, 2013, April 16, 2013, and May 31, 2013**

On December 7, 2012, Chip filed a motion for summary judgment. On February 26, 2013, a hearing was held on Chip's motion for summary judgment, at which the second hearing justice indicated that he was concerned that issues of fact existed with respect to Chip's knowledge, or lack thereof, about previous flooding and water penetration at the property. However, the second hearing justice also stated that the law of the case doctrine might be implicated by the first hearing justice's decision on Pinelli and RPZ's motion for summary

judgment with respect to the disclaimer.[6] Accordingly, the second hearing justice reserved his ruling on the law of the case doctrine, and he denied Chip's motion on the ground that factual issues remained concerning Chip's knowledge of prior flooding at the property.

On April 16, 2013, the parties reconvened, and the second hearing justice explained that he remained uncertain about the applicability of the law of the case doctrine to Chip's motion. The hearing justice requested supplemental memoranda from the parties on that issue. On May 31, 2013, after reviewing those written submissions, the second hearing justice issued a bench decision on the motions for summary judgment filed by Chip and RE/MAX. The second hearing justice explained that, pursuant to their supplemental memorandum, plaintiffs were no longer opposing the preclusive effect of the first hearing justice's decision under the law of the case doctrine. Accordingly, the second hearing justice ruled that the first hearing justice's decision granting Pinelli and RPZ's motion for summary judgment established that the merger and disclaimer clause contained in the purchase and sales agreement was valid and, further, that it barred plaintiffs from pursuing their claims for fraudulent misrepresentation, negligent misrepresentation, and negligence against Chip as well. Further, the second hearing justice ruled that, based upon plaintiffs' acquiescence in the dismissal of the claim for breach of contract against Chip, the claim for breach of the implied covenant of good faith and fair dealing must also be dismissed because it is not an independent cause of action; rather, it is inextricably connected to the claim for breach of contract. Finally, the second hearing justice granted

---

[6] "The law of the case doctrine holds that, 'after a judge has decided an interlocutory matter in a pending suit, a second judge, confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling.'" Chavers v. Fleet Bank (RI), N.A., 844 A.2d 666, 677 (R.I. 2004) (quoting Paolella v. Radiologic Leasing Associates, 769 A.2d 596, 599 (R.I. 2001)). We have explained that the law of the case doctrine is "particularly applicable when the rulings under consideration pertain to successive motions for summary judgment * * * ." Ferguson v. Marshall Contractors, Inc., 745 A.2d 147, 151 (R.I. 2000).

RE/MAX's motion for summary judgment holding that RE/MAX could not be held vicariously liable because Pinelli and RPZ were found not to be liable on the basis of the disclaimer. On June 3, 2013, final judgment entered in favor of all defendants. On June 13, 2013, plaintiffs filed a timely notice of appeal.

## II

### Standard of Review

"This Court reviews de novo a trial justice's decision granting summary judgment." Sola v. Leighton, 45 A.3d 502, 506 (R.I. 2012) (quoting Lynch v. Spirit Rent-A-Car, Inc., 965 A.2d 417, 424 (R.I. 2009)). "Summary judgment is appropriate only when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as [a] matter of law.'" Id. (quoting Plunkett v. State, 869 A.2d 1185, 1187 (R.I. 2005)). "Only when a review of the admissible evidence viewed in the light most favorable to the nonmoving party reveals no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law, will this Court uphold the trial justice's grant of summary judgment." Id. (quoting National Refrigeration, Inc. v. Standen Contracting Co., 942 A.2d 968, 971 (R.I. 2008)).

## III

### Analysis

On appeal, plaintiffs advance two arguments with regard to the statute of limitations. First, plaintiffs argue that defendants waived the statute of limitations defense because it was not raised in their answer as an affirmative defense. In addition, plaintiffs contend that genuine issues of material fact exist with respect to whether plaintiffs timely commenced suit because of the applicability of the discovery rule. Lastly, plaintiffs argue that genuine issues of material

fact exist with respect to the fraudulent misrepresentation claim; therefore, the grant of summary judgment should be reversed.

Conversely, defendants argue that summary judgment was properly granted on the negligence claims based on the statute of limitations because plaintiffs knew, or should have known, about any flooding and water penetration issues that may have occurred in 2005 or 2006. The defendants also contend that the claim for fraudulent inducement was properly dismissed because the "as is" disclaimer clause in the purchase and sales agreement was sufficiently specific to demonstrate that plaintiffs could not have justifiably relied on any alleged misrepresentation as a matter of law. Further, Chip argues that the claims for misrepresentation lodged against her must fail because there is no evidence that she had knowledge of previous flooding or water penetration at the property. In addition, Pinelli and RPZ argue that, as a matter of law, plaintiffs' reliance on any alleged misrepresentations was not justifiable; therefore, the claims for fraudulent and negligent misrepresentation were properly dismissed.

### A. Negligence Claims: Counts 2, 6, and 7

### 1. The Failure to Raise the Statute of Limitations Defense

The plaintiffs alleged three negligence-based claims: negligent misrepresentation against all defendants (count 2); negligence against all defendants (count 6); and breach of fiduciary duty against Pinelli (count 7).[7] At the outset, plaintiffs argue that defendants failed to plead the statute of limitations as an affirmative defense; therefore, it was waived. Although the statute of limitations was not raised in the answer, we have "unequivocally held that the expiration of a statute of limitations is an affirmative defense that must be raised <u>at or before trial</u> or it is waived." <u>Brown v. State</u>, 32 A.3d 901, 913 (R.I. 2011) (citing <u>State v. Lambrechts</u>, 585 A.2d

---

[7] It is undisputed that the negligence claims are subject to a three-year statute of limitations. <u>See</u> G.L. 1956 §§ 9-1-14 and 9-1-14.1.

645, 648 (R.I. 1991) (emphasis added)); see also Industrial National Bank v. Peloso, 121 R.I. 305, 308, 397 A.2d 1312, 1313-14 (1979) (allowing an affirmative defense to be raised by way of summary judgment). Here, defendants raised the statute of limitations defense well in advance of trial, by way of their motions for summary judgment. Further, it does not escape us that almost a year passed between the filing of the motion for summary judgment and the day that it was argued. In addition, at the time of the summary judgment hearing, there was a pending motion to amend defendants' answer to include the statute of limitations defense, which was rendered moot by the first hearing justice's decision to grant summary judgment to Pinelli and RPZ. Accordingly, there was no surprise to plaintiffs and defendants were not precluded from arguing the statute of limitations defense.

### 2. Application of the Discovery Rule

Next, plaintiffs argue that the statute of limitations should be tolled because they did not know, nor in the exercise of reasonable diligence should have known, that they were injured as a result of defendants' negligence until March 2010. The plaintiffs contend that it was reasonable that they did not discover their injuries until 2010 because they were justified in relying upon the representations of their fiduciary, Pinelli. However, a review of the record belies plaintiffs' contentions.

This Court has explained that "[s]tatutes of limitation 'are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" Ryan v. Roman Catholic Bishop of Providence, 941 A.2d 174, 181 (R.I. 2008) (quoting Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348-49 (1944)). "Generally, a cause of action accrues and the applicable statute of limitations begins to run at the time of the

- 11 -

injury to the aggrieved party." Martin v. Howard, 784 A.2d 291, 299 (R.I. 2001) (citing Plouffe v. Goodyear Tire and Rubber Co., 118 R.I. 288, 293, 373 A.2d 492, 495 (1977)). However, in certain "narrowly circumscribed factual situations," this Court has explained that "when the fact of the injury is unknown to the plaintiff when it occurs, the applicable statute of limitations will be tolled and will not begin to run until, in the exercise of reasonable diligence, the plaintiff should have discovered the injury or some injury-causing wrongful conduct." Id. (citing and quoting Renaud v. Sigma-Aldrich Corp., 662 A.2d 711, 714 (R.I. 1995)). "The reasonable diligence standard is based upon the perception of a reasonable person placed in circumstances similar to the plaintiff's, and also upon an objective assessment of whether such a person should have discovered that the defendant's wrongful conduct had caused him or her to be injured." Id. at 300.

In Lee v. Morin, 469 A.2d 358, 359 (R.I. 1983), the plaintiffs filed a negligence action more than six years after purchasing a house, seeking to recover for undiscovered latent defects in the property. This Court was asked to determine when the statute of limitations began to run in a case involving improvements to real property. Id. After considering three different tolling theories, we held that the limitations period "begins to run when the evidence of injury to property, resulting from the negligent act upon which the action is based, is sufficiently significant to alert the injured party to the possibility of a defect." Id. at 360. That holding was consistent with prior decisions of this Court that "have consistently held that in situations in which a reasonable person would not have discovered the legal action prior to the time of injury, the statute begins to run at the time the injury manifests itself." Id.

In the present case, even before executing the purchase and sales agreement, plaintiffs had inspected the property and had been informed about water issues relating to the basement

- 12 -

and that corrective action should be taken. Then, almost immediately after purchasing the property, indeed, even before they moved into it, plaintiffs experienced significant flooding that resulted in two to three feet of water accumulating in the basement. Shortly thereafter, plaintiffs were informed by the developer's son that, since 1968, the area was susceptible to significant flooding because of increased water flow. This certainly proved true because, over the next several years, they experienced multiple instances of flooding or water penetration. Finally, in March 2010, plaintiffs experienced another major flood, comparable to the October 2005 flood, that Elizabeth testified caused two feet of water to enter the basement.

Despite the repeated flooding of the property, plaintiffs argue that it was not until they had a conversation with their neighbors, the Blaises, after the March 2010 flood, that they were put on notice of defendants' alleged misstatements. The plaintiffs contend that the Blaises informed them that, in their opinion, Chip had to have known about previous flooding at the property. Therefore, plaintiffs conclude that the statute of limitations applicable to their negligence claims should be tolled because, until their conversation with the Blaises, they had no reason to believe that they had suffered an injury.

However, in light of the repeated instances of flooding and water penetration, we cannot agree. Our case law makes clear that the pertinent inquiry is "whether, in the exercise of reasonable diligence, [the] plaintiff should have discovered the alleged [misconduct]." Canavan v. Lovett, Schefrin and Harnett, 862 A.2d 778, 784 (R.I. 2004) (citing Richmond Square Capital Corp. v. Mittleman, 689 A.2d 1067, 1069 (R.I. 1997) (mem.)). When confronted with numerous instances of flooding and water problems during the years that followed the purchase of the property, as well as information that the area has been flood-prone since 1968, a reasonable person would have been put on notice more than three years before suit was filed that a potential

claim existed. Therefore, plaintiffs are not entitled to avail themselves of the protection of the discovery rule.[8]

## B. Fraud Claim: Count 1

The plaintiffs' next argument on appeal is that genuine issues of material fact preclude summary judgment from entering on their claim for fraudulent misrepresentation. The defendants, on the other hand, aver that count 1 was properly dismissed because the disclaimer clause in the purchase and sales agreement was sufficiently specific to demonstrate that plaintiffs could not have justifiably relied on any alleged misrepresentation as a matter of law. Chip argues that count 1 fails because the record is bare of any evidence that she had knowledge of previous flooding or water penetration at the property. In addition, Pinelli and RPZ argue that, as to them, plaintiffs' reliance on any alleged misrepresentations was not justifiable as a matter of law; therefore, the claims for fraudulent misrepresentation were properly dismissed.

"To establish a prima facie fraud claim, 'the plaintiff must prove that the defendant made a false representation intending thereby to induce [the] plaintiff to rely thereon and that the plaintiff justifiably relied thereon to his or her damage.'" Parker v. Byrne, 996 A.2d 627, 634 (R.I. 2010) (quoting Bitting v. Gray, 897 A.2d 25, 34 (R.I. 2006)). "'[A] party who has been induced by fraud to enter into a contract' may elect either to rescind the contract, or 'to affirm the contract and sue for damages in an action for intentional deceit or misrepresentation.'"

---

[8] The plaintiffs also argue that the statute of limitations should be tolled, pursuant to § 9-1-20, because defendants fraudulently concealed their alleged misconduct. We have explained that "[t]he key consideration is whether or not the defendant fraudulently misrepresented material facts, thereby misleading the plaintiff into believing that no cause of action existed." Ryan v. Roman Catholic Bishop of Providence, 941 A.2d 174, 183 (R.I. 2008). In sum, the record is devoid of any evidence that defendants affirmatively "conceal[ed] from [plaintiffs] the existence of the cause of action[;]" therefore, plaintiffs are not entitled to the protections afforded by § 9-1-20.

Stebbins v. Wells, 766 A.2d 369, 372 (R.I. 2001) (quoting Travers v. Spidell, 682 A.2d 471, 472 (R.I. 1996)).

In LaFazia v. Howe, 575 A.2d 182, 183 (R.I. 1990), the parties discussed, at length, the profitability of a delicatessen before it was sold to the plaintiff-buyers. The buyers sought tax returns, accounts receivable, accounts payable, and other records so that they could intelligently assess the profitability of the business. Id. The sellers indicated to them that they were always paid in cash and, as a result, they "did not keep very good books," but they nonetheless provided their tax returns for buyers' inspection. Id. When they reviewed the documents provided to them, the buyers at first decided that the business was not viable. Id. However, after further reassuring representations were made by the sellers as to the profitability of the enterprise, the buyers entered into an agreement to purchase the business. Id. Significantly, the agreement included a merger and disclaimer clause that went to the heart of the matter at issue during trial, providing that "[t]he Buyers rely on their own judgment as to the past, present or prospective volume of business or profits of the business of the Seller and does [sic] not rely on any representations of the Seller with respect to the same." Id.

Shortly after the sale was finalized, the buyers realized that the business was not as profitable as they claimed that they had been led to believe and, as a result, they failed to pay the balance due on the promissory note. LaFazia, 575 A.2d at 183-84. The sellers initiated suit for breach of contract, seeking to collect the remainder of the promissory note, and the buyers filed a counterclaim seeking to recover for fraudulent misrepresentation. Id. at 184. The Superior Court granted summary judgment to the sellers on the buyers' fraud claim, and that judgment was appealed to this Court. Id. We affirmed the grant of summary judgment, holding that "the merger and disclaimer clauses preclude [the buyers] from asserting that [the sellers] made

- 15 -

material misrepresentations regarding the profitability of the business * * * prevent[ing the buyers] from successfully claiming reliance on prior representations." Id. at 185. The Court explained that it was significant that the merger and disclaimer at issue was "not a general but a specific disclaimer" that contained "specific language regarding the very matter concerning which [the buyers] now claim they were defrauded." Id. at 185, 186.

In Travers, 682 A.2d at 472, this Court was tasked with determining whether a general merger and disclaimer clause contained in a purchase and sales agreement barred the buyers' fraud claim based on the sellers' alleged misrepresentations. The buyers alleged that the sellers misrepresented that a home's well was located within the boundaries of the conveyed property when, in actuality, the well was on a neighbor's property. Id. The purchase and sales agreement in that case also contained a merger and disclaimer clause, which provided that "[w]e, the parties hereto, each declare that this instrument contains the entire agreement between the parties, and that it is subject to no understandings, conditions or representations other than those expressly stated therein." Id. On appeal, we explained that, unlike LaFazia, the disclaimer clause at issue was general in nature and was not specific because it "specifically addresses neither the well's location nor the boundaries of the property." Travers, 682 A.2d at 473. For that reason, we held that the general merger and disclaimer language did not bar the buyers' fraud claim as a matter of law. Id.

Here, defendants aver that the "as is" disclaimer clause in the purchase and sales agreement was sufficiently specific to the extent that, as a matter of law, plaintiffs could not have justifiably relied on any alleged misrepresentation. The merger and disclaimer clause at issue in this case provides, in pertinent part, that "[t]he Property is being sold in 'AS IS' condition and Buyer represents that it has not relied on the oral representations of the Seller, or the Broker(s) or

- 16 -

their agents as to the character or quality of the Property." With respect to inspections, the parties added a provision that provided that "Buyers have already completed thier [sic] inspection of the property and are buying it in as in [sic] condition all other conditions stated in this contract remain in force." The defendants contend that the above-referenced portions of the purchase and sales agreement, when combined with the fact that plaintiffs had previously had a professional inspection performed on their behalf, obviates any claim of reasonable reliance.

However, unlike the disclaimer in LaFazia, 575 A.2d at 183, which explicitly stated that buyers were relying on their own knowledge concerning the very issue at trial, profitability of the business, the instant disclaimer provides only that plaintiffs have not relied on oral representations "as to the character or quality of the Property." In our opinion, the disclaimer more closely resembles the more general disclaimer addressed in Travers, 682 A.2d at 472, which provided that the purchase and sales agreement embodied the entire agreement and was "subject to no understandings, conditions or representations other than those expressly stated therein." Id. The defendants contend, however, that, when combined with the waiver of the right to inspect, as well as the inspection report that was issued prior to entering into the agreement, the disclaimer is sufficiently specific as to the very nature of plaintiffs' fraud claim. But, it is significant to us that neither the disclaimer clause nor the provisions concerning plaintiffs' waiver of their right to inspect, contains any reference to the issues of flooding and water penetration. Because the disclaimer clause was general, as opposed to specific, with respect to the nature of the claim at issue, it is our opinion that the first hearing justice's grant of summary judgment as to count 1 was improper.

Notwithstanding the absence of an effective disclaimer, Chip argues that the claims for fraud still must fail as to her because there is no evidence that she had any knowledge of

previous flooding at the property. However, Chip's father testified at a deposition that, even though he was unsure if he told Chip about the 1998 flood, "I'm sure she knew about it," and that "[i]t's just common sense that the discussion [about the 1998 flood] had to have taken place at some point." Therefore, and in the context of a summary judgment proceeding, genuine issues of material fact exist with respect to Chip's knowledge, or lack thereof, of the 1998 flood.

Lastly, Pinelli and RPZ argue that plaintiffs' claim for fraudulent inducement fails as a matter of law as to them because plaintiffs cannot demonstrate that they reasonably relied on any statement Pinelli may have made or that Pinelli intended to induce them to purchase the property. However, in light of the allegation that Pinelli said that "maybe an inch or so" of water entered the basement previously and the fact that he was financially interested in finalizing the sale as an agent for both plaintiffs and Chip, it is our opinion that issues of fact exist as to the fraud claim against Pinelli and RPZ. Moreover, because the dismissal of the fraud claim against RE/MAX was based upon the first motion justice's ruling that the purchase and sales agreement's disclaimer clause was effective to bar the fraud claim, a ruling that we have reversed, and because of the existence of an agency relationship sufficient to allow vicarious liability to attach to RE/MAX is an issue of fact, count 1 also survives as to RE/MAX.

### C. Remaining Contract Claim: Count 4

The plaintiffs' last argument on appeal is that they have a viable cause of action against Chip under count 4, breach of the implied warranty of good faith and fair dealing, because it is a separate and independent cause of action.[9] This Court has explained that "[v]irtually every contract contains an implied covenant of good faith and fair dealing between the parties."

---

[9] During the course of the summary judgment proceedings, plaintiffs voluntarily dismissed count 5, and conceded that summary judgment should be granted on count 4 in favor of Pinelli because he was not a party to the purchase and sales agreement. Therefore, the only remaining contract claim is count 4 against Chip.

Dovenmuehle Mortgage, Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002) (quoting Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I. 1996)). The implied covenant of good faith and fair dealing ensures that "contractual objectives may be achieved," Ide Farm & Stable, Inc. v. Cardi, 110 R.I. 735, 739, 297 A.2d 643, 645 (1972), and that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 17A Am. Jur. 2d Contracts § 370 at 356 (2004). However, we have explained that a claim for breach of the implied covenant of good faith and fair dealing does not create an independent cause of action separate and apart from a claim for breach of contract. See A. A. A. Pool Service & Supply, Inc. v. Aetna Casualty & Surety Co., 121 R.I. 96, 99-100, 395 A.2d 724, 725-26 (1978). Accordingly, the hearing justice properly granted Chip's motion for summary judgment with respect to count 4.

## IV

### Conclusion

For the reasons set forth above, we affirm the grants of summary judgment on the plaintiffs' contract claims, counts 4 and 5, and the negligence claims, counts 2, 6, and 7. However, we vacate the grant of summary judgment on the plaintiffs' fraud claim, count 1, and remand the case to the Superior Court for further proceedings.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    Joseph McNulty et al. v. Kristen Chip et al.

**CASE NO:**    No. 2014-97-Appeal.
(PC 10-3678)

**COURT:**    Supreme Court

**DATE OPINION FILED:**  June 4, 2015

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Brian Van Couyghen

    Associate Justice Luis M. Matos

**ATTORNEYS ON APPEAL:**

    For Plaintiffs:  Chip Muller, Esq.

    For Defendant:  Rajaram Suryanarayan, Esq.
                 Michael J. Jacobs, Esq.